**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 09-3388 & 09-3389
_____


UNITED STATES OF AMERICA,
                    Appellant/Cross-Appellee


v.


VINCENT J. FUMO,
                    Appellee/Cross-Appellant


_____

No. 09-3390
_____


UNITED STATES OF AMERICA,
                    Appellant


v.


RUTH ARNAO


_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(Nos. 06-cr-00319-003 & 06-cr-00319-004)
District Judge: Honorable Ronald L. Buckwalter

Argued May 25, 2011

Before: FUENTES, GARTH, NYGAARD, Circuit Judges

(Opinion Filed: August 23, 2011)

Zane David Memeger, Esq.
Robert A. Zauzmer, Esq. [ARGUED]
John J. Pease, Esq.
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Counsel for Appellant/Cross-Appellee

Samuel J. Buffone, Esq. [ARGUED]
BuckleySandler LLP
1250 24th Street NW, Suite 700
Washington, D.C. 20037

Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA 19003

Counsel for Appellee/Cross-Appellant Fumo

Patrick J. Egan, Esq. [ARGUED]
Eric E. Reed, Esq.
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103

Counsel for Appellee Arnao

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

On July 14, 2010, the United States District Court for the Eastern District of Pennsylvania sentenced former Pennsylvania State Senator Vincent J. Fumo to 55 months' imprisonment, a $411,000 fine, and $2,340,839 in restitution, arising from his jury conviction on 137 counts of fraud, tax evasion, and obstruction of justice. A week later, the District Court sentenced former Fumo aide Ruth Arnao to imprisonment of one year and one day, a $45,000 fine, and joint and several restitution with Fumo of up to $792,802, arising from her jury conviction on 45 counts of fraud, tax evasion, and obstruction of justice. On appeal, the Government argues that the District Court made numerous procedural errors in arriving at both sentences. In particular, the Government asserts that the District Court failed to announce a final guidelines sentencing range for Fumo. Fumo cross-appeals, contending that the District Court erred when it denied his motion for a new trial based on alleged jury partiality and the District Court's admission of evidence

related to Pennsylvania's public employee ethics law. For the following reasons, we will affirm Fumo's conviction, vacate the sentences of Fumo and Arnao, and remand both for resentencing before the District Court.

## I.

## A. Background

Vincent Fumo was a high-profile Pennsylvania state senator at the center of one of the largest political scandals in recent state history. Fumo was first elected to the State Senate in 1978 from a district in South Philadelphia.[1] He eventually became Chairman of the Senate Democratic Appropriations Committee, which put him in control of millions of dollars that could be dispensed at his discretion for legislative purposes. Fumo served in the Pennsylvania State Senate for thirty years, where it is widely agreed that he became one of the most powerful political figures in the state.

During his three decades as a state senator, Fumo frequently directed his publicly paid Senate employees to attend to his personal needs and political interests during their working hours, as well as at night and on weekends. Fumo's Philadelphia district office was staffed by ten such

---

[1] In 1980, Fumo was convicted of taking part in a scheme to place local Democratic party workers on the state legislative payroll as "ghost employees." Fumo's conviction was later overturned because of a variance between the indictment and the proof offered at trial—a decision that we affirmed on appeal. *See United States v. Camiel*, 689 F.2d 31 (3d Cir. 1982).

employees, whose duties included providing constituent services to the residents of Fumo's district. However, the staffers often also provided Fumo with campaign and personal assistance: organizing political fundraisers and mailings, processing bills for business accounts, and handling various aspects of Fumo's personal finances. Various aides also acted as his housekeeper, drove him from place to place, managed the refurbishment of his 33-room house, ran personal errands, and even drove his daughter to school. During Fumo's annual trip to Martha's Vineyard, Massachusetts, his Senate aides would drive two vehicles from Philadelphia and back, filled with the luggage of Fumo and his guests. Staffers also used their time to assist a Philadelphia City Councilman who was Fumo's ally and, for two months, to advance the campaign of an ultimately unsuccessful Pennsylvania Democratic gubernatorial candidate. Moreover, Fumo misused his Senate staff in Harrisburg—several of them renovated and developed a farm he had purchased in 2003 as a residential and business enterprise. In exchange, Fumo arranged salaries for his employees that were substantially greater than those designated by the State Senate for comparable Senate employees.

Fumo also provided non-staffers, such as contractors, family members, and girlfriends with access to Senate resources, including laptops and computer assistance. Further, he used Senate funds to hire contractors for non-legislative tasks. For instance, Fumo obtained a $40,000 state contract for a private investigator who, in addition to his legitimate activities, conducted surveillance on Fumo's former wife, girlfriends, ex-girlfriends' boyfriends, and at times, political rivals. He obtained an $80,000 state contract for a consultant

who spent much of his time assisting Fumo with political races and a $45,000 salary for an individual who spent most of his time assisting with Fumo's farm. Mitchell Rubin, the boyfriend and later husband of Ruth Arnao, was paid $30,000 per year for five years, without doing much, if any, work at all.

In order to facilitate his use of public funds for his own purposes, Fumo falsely represented that employees and contractors receiving payment by the Senate were performing proper and legitimate legislative functions that they only partially or never in fact completed, and failed to disclose the private and political services that they were actually performing. Fumo also provided false job descriptions and elevated position classifications that conflicted with the duties that employees actually carried out.

In 1991, Fumo and his staff founded a non-profit organization that became known as the Citizens Alliance for Better Neighborhoods ("Citizens Alliance"). Arnao, a Senate employee on Fumo's staff, became its director. Citizens Alliance's stated purpose was to improve Philadelphia neighborhoods through projects such as removing trash, sweeping streets, trimming trees, clearing snow, and cleaning alleys and abandoned lots. Citizens Alliance received much of its funding from grants obtained by Fumo from the state and other entities. In 1998, after Fumo brought litigation challenging its utility rates, the Philadelphia Electric Company ("PECO") privately agreed to donate $17 million to Citizens Alliance as part of a settlement agreement. The existence of the $17 million contribution only became public knowledge in November 2003, when it was reported by the *Philadelphia Inquirer*. After the influx of $17 million,

Citizens Alliance expanded the scope of its work, acquiring properties for renovation, opening a charter school, and attempting to develop an office building for high-tech companies.

However, concurrent with its expanded efforts, Fumo and Arnao began to use Citizens Alliance funds for their personal benefit, including $90,000 for tools and $6,528 for vacuum cleaners and floor machines used in Fumo's homes. Citizens Alliance also provided Fumo and his staff with vehicles, including a $38,000 minivan, a $52,000 luxury SUV, and a $25,000 jeep. In total, more than $387,325 went towards acquiring and maintaining vehicles for the use of Fumo, Arnao, legislative aides, and family members. Further, Citizens Alliance became the landlord of Fumo's office on Tasker Street in Philadelphia. While the Senate spent $90,000 in rent during a five-year period, Citizens Alliance spent over $600,000 to furnish, maintain, and rent Fumo's office to him at a discount. The office also served as his campaign office and ward headquarters. Further, Citizens Alliance paid for cell phones for many of Fumo's staffers, as well as his daughter. It also paid $39,000 for Fumo's trip to Cuba with five friends and $50,000 for a "war dog" memorial in Bucks County.

Fumo used Citizens Alliance in violation of federal 501(c)(3) rules for charitable organizations by having it pay $250,000 for political polling, $20,000 for a lawsuit against a Senate rival, and $68,000 to support opposition to the Government's construction of dunes along the Jersey shore, which would have blocked his seaside house's view of the ocean and reduced its property value. In order to oppose the dunes, Fumo had his Senate counsel create a nonprofit entity

called "Riparian Defense Fund, Inc." to funnel funds from Citizens Alliance, and then misled the IRS and Pennsylvania Secretary of State as to the nature and purpose of the organization. Further, Fumo misrepresented political and campaign expenses as "community development consulting" expenses on Citizens Alliance's tax filings, deceiving the IRS yet again.

Just as he had done with his public employees, Fumo directed Citizens Alliance staff to assist with his personal matters, traveling to his house on the Jersey shore to repair and paint his dock and deck, picking up trash, and undertaking other errands and tasks. They also frequently cleaned and served his Philadelphia home, and delivered equipment and personal items to his farm. Additionally, Citizens Alliance paid for a $27,000 bulldozer, a lawn tractor, a dump truck, an all-terrain vehicle, and a Ford F-150 pickup truck for his Harrisburg-area farm. Fumo and Arnao never disclosed the funds used for Fumo's personal benefit to Citizens Alliance's accountants, and when asked about those funds by an accountant, Arnao misstated their purpose. Fumo and Arnao also made repeated misrepresentations to journalists about Citizens Alliance and how it spent its funds.

Fumo served on the board of directors of the Independence Seaport Museum ("ISM"). Board members did not receive compensation or benefits from the museum, but were expected to help the museum develop and solicit donors. While Fumo did not donate or solicit much in the way of donations for the ISM, he did use his influence to obtain grants for the museum from the state and other entities. However, at the expense of the ISM, he also repeatedly used its yachts for pleasure cruises and its ship models for

8

decorations in his home and office. These personal uses of the ISM's resources, which were approved by ISM's president John Carter, were in violation of the museum's policies and bylaws. Fumo later claimed that he used the yachts to help raise money for the museum and that he sometimes paid for their use.

In 2003, the Government began investigating Fumo. In December, the *Philadelphia Inquirer* published a series of articles about Citizens Alliance's use of funds and its relationship with Fumo. Shortly thereafter, Fumo directed a computer technician on his staff to ensure that all emails to and from Fumo and others were deleted. When the *Inquirer* ran an article entitled "FBI Probes Fumo Deal" on January 25, 2004, Fumo involved additional Senate aides and expanded the scope of his attempts to delete emails. Throughout 2004 his aides, including Arnao, deleted email from numerous computers and communication devices, and then "wiped" the computers using sophisticated programs in order to prevent forensic analysis. These efforts included wiping computers at Arnao's home and at Citizens Alliance. Despite Fumo's efforts, two of the aides involved in the deletion kept emails between each other, including emails regarding Fumo's instructions to eliminate computer evidence of the fraud.

## B. The Trial

The Government charged Fumo and Arnao under what was to later become a 141 count superseding indictment. Counts 1 through 64 related to fraud on the Pennsylvania State Senate, Counts 65 through 98 to fraud on Citizens Alliance, Counts 99 through 103 to tax evasion by Citizens

9

Alliance, Counts 104 through 108 to fraud on ISM, and Counts 109 through 141 to obstruction of justice and conspiracy to commit obstruction of justice. Fumo was charged in 139 counts, including all but Counts 100 and 102. At trial, the Government voluntarily moved to dismiss Counts 36 and 38 against Fumo. Arnao was charged in 45 counts, including Counts 65 through 98, related to the fraud on Citizens Alliance, Counts 99, 100, and 102, related to tax evasion, and Counts 109, 121, 124, 126, 127, 129, 132, and 134, related to obstruction of justice.

The case was originally assigned to the Honorable William H. Yohn, Jr., and after some delay while Fumo found satisfactory defense counsel, jury selection began on September 8, 2008. After the case was reassigned to the Honorable Ronald L. Buckwalter, jury selection resumed on October 20, 2008. The trial lasted an additional five months, with the proceedings halted on Fridays. By the time it rested its case on January 26, 2009, the Government had called 80 witnesses in its case-in-chief. The defendants then called an additional 25 witnesses, including Fumo himself, and rested their case on February 18, 2009. On March 16, 2009, after four days of deliberation, the jury convicted Fumo of all 137 counts presented against him, and Arnao of all 45 counts presented against her.

A number of events occurred during the trial that Fumo now asserts as the bases for his cross-appeal. First, during the trial, the Government called John J. Contino as an expert witness to testify about the Pennsylvania Public Official and Employee Ethics Act, 65 Pa. Con. Stat. Ann. § 1101, *et seq.* (the "Ethics Act"). Contino is the Executive Director of the State Ethics Commission (the "Commission"),

10

the body charged with enforcing the Ethics Act. Section 1103(a) of The Ethics Act prohibits a public official or employee from engaging in conduct that constitutes a "conflict of interest," which is defined at § 1102 as the "[u]se by a public official or public employee of the authority of his office or employment . . . for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated."

Prior to the trial, Judge Yohn had found Contino to be "well qualified" as an expert and ruled that it was "appropriate for him to talk about the Ethics Act." (J.A. 431). During trial, Contino testified as to how and to whom the Ethics Act applied, whether it was mandatory in nature, and as to how the legislature was apprised of the Ethics Act and the Commission's interpretation of it. Contino also referenced abridged versions of the Commission's opinions, summarizing violations that were considered and ruled upon by the Commission. He did not, however, express an opinion as to whether Fumo's own actions violated the Ethics Act or whether Fumo was guilty of the federal charges against him.

The Government also extensively cross-examined Fumo on the subject of the Ethics Act and specifically his knowledge and understanding of it. At the time of the cross-examination, the District Court provided a limiting instruction to the jury, reminding them that no law required Fumo to study the decisions or reports of the Commission.

At the conclusion of the trial, the District Court further instructed the jury on the Ethics Act, telling them that they could "consider [such] evidence . . . to the extent that [they] find it sheds light on questions of willfulness, intent to

11

defraud, and good faith" but that "violation of the ethics laws should not be considered by [them] as implying a violation of federal criminal law" and that they "may not convict Fumo of any of the counts alleging that he conspired or attempted to execute a scheme to defraud the Senate of money or property simply on the basis of the conclusion that he may have violated a state ethics law." (J.A. 4363).

On March 15, 2009, while jury deliberations were ongoing, a local television station reported that one of the jurors, hereinafter referred to as "Juror 1," had made postings on both his Facebook and Twitter pages related to the trial. That night, which was the night before the jury returned its verdict, Juror 1 was watching television when he learned that the media was following the comments he had made on the internet. He subsequently panicked and deleted the comments from his Facebook page.

Prior to deleting them, Juror 1 made the following comments on his Facebook "wall" during jury selection and the trial:

> -- Sept. 18:   (apparently upon a continuance of the trial due to judge's illness): "[Juror 1] is glad he got a 5 week reprieve, but still could use the money . . ."

> -- Jan. 11:   (apparently referring to the end of the government's case): "[Juror 1] is wondering if this could be the week to end Part 1?"

> -- Jan. 21:   "[Juror 1] wonders if today will really be the end of Part 1???"

-- Mar. 4: (conclusion of closing arguments): "[Juror 1] can't believe tomorrow may actually be the end!!!"[2]

-- Mar. 8: (Sunday evening before second day of deliberations): "[Juror 1] is not sure about tomorrow . . ."[3]

-- Mar. 9: (end of second day of deliberations): "[Juror 1] says today was much better than expected and tomorrow looks promising too!"

-- Mar. 13: (Friday after completion of first week of deliberations): "Stay tuned for the big announcement on Monday everyone!"

(J.A. 587-88).

Juror 1's Facebook comments appeared over the many months of the trial, and in the midst of dozens of other comments he made unrelated to the trial. It was the final, March 13 post that was the subject of media attention. With

_____

[2] A friend responded to the March 4 Facebook post by asking "of what?" Juror 1 responded: "Can't say till tomorrow! LOL." (J.A. 592 n.30).

[3] A friend responded to the March 8 Facebook post by asking "Why?" Juror 1 responded: "think of the last 5 months dear." (J.A. 592).

regard to Twitter, Juror 1 made a single comment or "tweet" on March 13, stating "This is it . . . no looking back now!" (J.A. 587).

When Fumo learned of Juror 1's Facebook and Twitter comments, he moved to disqualify Juror 1 from the jury. The District Court held an *in camera* review of the issue, and questioned Juror 1 about his activities on these two websites and his general media consumption. Juror 1 told the judge that he saw the news report that night because he had been watching another show when the local news began. He nevertheless explained that he had avoided television news during the entire trial. He also affirmed that he had not discussed the substance of the case with anyone. Juror 1 further stated that he had made the comments "for my benefit to just get it out of my head, similar to a blog posting or somebody journaling something." (J.A. 589).

In a written opinion, the District Court determined that there was no evidence that Juror 1 received outside influence due to his Facebook or Twitter postings and concluded that, although in violation of his instruction not to discuss the case outside of the jury room, they were "nothing more than harmless ramblings having no prejudicial effect. They were so vague as to be virtually meaningless." (J.A. 592).

More than three months after the verdict, but before sentencing, Fumo filed a second motion for a new trial, attaching the affidavit of counsel Dennis Cogan. The affidavit asserted that journalist Ralph Cipriano, writing for *Philadelphia Magazine*, had contacted Cogan regarding information he obtained during post-verdict interviews with several jurors. According to an article written by Cipriano,

14

on the morning of March 16, the day of the verdict, all of the jurors had heard media reports about Juror 1's use of Facebook and Twitter. Further, another juror hereinafter referred to as "Juror 2," indicated that while at her workplace on a Friday, several co-workers informed her of Fumo's prior overturned conviction, as well as the conviction and imprisonment of John Carter, former president of the ISM. Both of these facts had previously been excluded from the trial by the District Court. Specifically, the article stated that Juror 2 had told Cipriano that:

> Co-workers stopped by and talked about things in the media, such as Fumo's prior 1980 conviction, subsequently overturned by a judge, for hiring ghost employees. Judge Buckwalter repeatedly turned down prosecution requests to tell the jury about that prior conviction. But [Juror 2] found out anyway, even though she held up her hands and told co-workers: *Please don't talk to me, I can't discuss the case.* Co-workers also told her that John Carter, former president of the Independence Seaport Museum, and the guy who gave Fumo permission to take free yacht trips, was doing time for fraud. The judge didn't want the jury to know about Carter, either.

(J.A. 703-04) (emphasis in original). There was no evidence that any other juror had learned of Fumo's prior conviction or the conviction of Carter, and the other five jurors interviewed by Cipriano did not mention either fact.

The District Court denied the motion, concluding that

the information was an insufficient basis to hold a hearing and that, even if everything asserted by Juror 2 were true, it would not constitute the showing of substantial prejudice required to grant a new trial.

## C. Sentencing

On July 8, the District Court held a sentencing hearing at which the parties made arguments directed at the sentencing guidelines calculations for both Fumo and Arnao. The Government adopted the position of the Pre-sentence Report ("PSR"), which divided Fumo's crimes into two groups pursuant to § 3D1.2 of the Sentencing Guidelines—the first made up of the 134 fraud and obstruction of justice counts, and the second consisting of the three tax evasion counts (Counts 99, 101, and 103).

As to the first group, the PSR began with a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1). It then added 18 levels under § 2B1.1(b)(1)(J) because it calculated the loss from the fraud to be greater than $2,500,000, and specifically $4,339,041. The PSR then added 2 levels under § 2B1.1(b)(8)(A) because it concluded Fumo misrepresented that he was acting on behalf of a charitable organization, Citizens Alliance. Similarly, it added 2 levels under § 2B1.1(b)(9)(C) because the fraud involved the use of sophisticated means, in that Fumo used a shell corporation, Eastern Leasing Corp., to purchase vehicles for his personal use and conduct political polling, and used a consulting firm as a conduit to conceal his role in a lawsuit against one of his political rivals. The PSR added an additional 4 levels under § 3B1.1(a) for Fumo's role as the organizer or leader of the fraud, and 2 levels under § 3B1.3 because he was in a

16

position of public trust. Finally, under § 3C1.1, it added 2 levels for Fumo's obstruction of justice during the investigation of the offense, and 2 levels for his obstruction of justice in perjuring himself at trial. In total, the PSR calculated Fumo's adjusted offense level for the fraud group as 39.

As to the tax evasion group, the PSR began with a base offense level of 24 under §§ 2T1.1(a)(1) and 2T4.1(J) because the tax loss was more than $2,500,000, and specifically $4,624,300. It then added 2 levels under § 2T1.1(b)(2) because the offense involved sophisticated means, for a total adjusted offense level of 26.

Because the tax evasion group's offense level of 26 was more than 8 levels below the fraud group's offense level of 39, pursuant to § 3D1.4(c), no additional levels were added to the larger of the two. Accordingly, the PSR calculated, and the Government argued, that the District Court should find Fumo's total adjusted offense level to be 39 and his criminal history category to be I, which would mean a guideline range of 262 to 327 months' imprisonment.

The day after the July 8 hearing, the District Court issued an order ruling that it would not apply the 2-level enhancement for charitable misrepresentation, the 2-level enhancement for sophisticated means, or the second 2-level obstruction of justice enhancement for perjury at trial. It also calculated the total loss from the fraud to be $2,379,914—about $2,000,000 less than the Government's calculation and a reduction of 2 additional levels. The District Court also declined to apply the 2-level enhancement for sophisticated means to the tax evasion group. Additionally, Fumo

requested two downward departures based on his physical health under § 5H1.4 and for extraordinary public service under § 5H1.11. The District Court denied the former and reserved judgment on the latter until the final sentencing hearing. With reduced adjusted offense levels of 31 and 24 for the fraud and tax evasion groups, respectively, the combined offense level became 32 under § 3D1.4(b), translating into a guideline range of 121 to 151 months' imprisonment.

On July 14, the District Court held another lengthy hearing. When the Government learned that the Court had calculated a guideline range of 121 to 151 months, it sought an upward variance, arguing that the adjusted range did not adequately represent or take into account the full loss from the fraud, the damage to public institutions, Fumo's alleged perjury at trial, other obstructive conduct, and Fumo's alleged lack of remorse. The District Court declined to vary upwards. It also denied Fumo's request for a departure on the basis of his medical condition. Then, after hearing from six witnesses who spoke on Fumo's behalf, and reviewing hundreds of letters from the public, it found that Fumo had "worked hard for the public and . . . worked extraordinarily hard" such that it would "grant a departure from the guidelines." (J.A. 1622-23). Without enunciating any modification to the guideline range of 121 to 151 months, the District Court then sentenced Fumo to a term of imprisonment of 55 months, three years of supervised release, a $411,000 fine, a $13,700 special assessment, $2,084,979 in restitution, and $255,860 in prejudgment interest on the restitution.

Fumo filed a Motion for Correction of Sentence under Federal Rule of Criminal Procedure 35(a), asking the Court to

18

resolve various issues related to the sentence. Among the issues raised was the fact that the District Court had, during the July 14 sentencing hearing, three times referred to the sentence as a "departure" from the guidelines range. The motion papers noted that "[w]hen a sentencing court grants a true 'departure,' [as opposed to a variance,] it must 'state how the departure affects the Guidelines calculation.' This Court[] fail[ed] to make such a statement . . . ." (J.A. 1629) (quoting *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc)). They also suggested that "[i]n context, it appears that the Court intended the sentence as a statute-based 'variance,' designed to achieve a punishment sufficient but not greater than necessary to fulfill the objectives set forth at 18 U.S.C. § 3553(a)(2), rather than as a Guidelines Manual-based 'departure.'" (J.A. 1629). Fumo asked that the Court "correct this technical error." (J.A. 1629). The Government filed a response, contesting Fumo's characterization of the Court's below-guideline sentence as a variance and noting that "the Court repeatedly stated that it decided to grant the departure motion based on public service." (J.A. 1635).

The following day, the District Court issued a Memorandum and Order, which among other things, explained that "[t]he government correctly states that the court announced it was granting a departure. Thereafter, the court never enunciated the guideline level to which it departed, and, in fact, never reached the sentence it did by consulting any specific level on the guideline chart." (J.A. 1653). The District Court also filed a Judgment and a formal Statement of Reasons. The Statement read, in pertinent part:

> I next determined whether there should be a departure from the guidelines and

announced at the sentencing hearing that there should be based on my finding extraordinary good works by the defendant. I did not announce what specific guideline level the offense fell into; that is to say, the precise number of levels by which I intended to depart because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines.

Having advised counsel of the offense level that I found and my intent to depart downward, I then proceeded to hear from counsel their respective analyses of what an appropriate sentence should be.

The procedure I followed was perhaps more akin to that associated with a variance than a downward departure because I never announced nor have I ever determined to what guideline level I had departed. Ultimately, the argument over which it was elevates form over substance.

(Sealed App. 185-86). The Statement of Reasons further indicated that the Court had granted Fumo a departure under § 5H1.11 of the Sentencing Guidelines for "Military Record, Charitable Service, Good Works."

After sentencing Fumo, the District Court held a sentencing hearing for Arnao. The PSR originally recommended, and the Government argued, that the loss from Arnao's fraud was between $1 and $2.5 million, leading to an

offense level of 23 under § 2B1.1(b)(1)(I) of the Sentencing Guidelines. The PSR also recommended 2-level enhancements for the use of sophisticated means, misrepresentation on behalf of a charitable organization, and obstructions of justice, generating a total adjusted offense level of 29. Just as for Fumo, the PSR's offense level calculation for the tax evasion group began with a base offense level of 24 and then added 2 levels because the offense involved sophisticated means, for a total adjusted offense level of 26. Under the grouping rules of § 3D1.4, two additional levels were added to the higher offense level of 29, making the combined offense level 31. With a criminal history category of I, this entailed a sentencing range of 108 to 135 months.

At the hearing, the District Court rejected the sophisticated means enhancement and determined that the loss from the Citizens Alliance fraud was less than $1,000,000, and specifically $958,080, thus reducing the fraud and tax evasion group offense levels to 25 and 24, respectively. This created a combined total offense level of 27 under the grouping rules of § 3D1.4 and a guidelines sentencing range of 70 to 87 months. The District Court then imposed a sentence of one year and one day—a substantial downward variance—to run concurrently on all counts, three years' supervised release, a $45,000 fine, a $4,500 special assessment, and restitution to Citizens Alliance in the amount of $792,802, jointly and severally with Fumo.

## II.[4]

---

[4] The District Court had jurisdiction over this matter under 18

21

**Appeal of Fumo's conviction**

## A. Evidence relating to the Pennsylvania Ethics Act

In his appeal of the conviction, Fumo argues that the evidence presented by the Government with regard to the state Ethics Act was irrelevant to the federal criminal charges against him, and was highly prejudicial because it was likely to confuse the jury and suggest that Fumo was in violation of state law. The District Court's rulings regarding the admissibility of evidence and expert testimony are reviewed for abuse of discretion. *United States v. Mathis*, 264 F.3d 321, 335 (3d Cir. 2001); *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

The Government responds that evidence regarding the Ethics Act was of substantial relevance because it was necessary to show that the Senate did not approve of the kind of expenditures Fumo made using state money, as well as to show that Fumo intended to deceive the Senate by misleading it about how he was spending that money. The Government notes that this was particularly true given Fumo's initial theory of the case at trial—that no rules or laws barred employing Senate resources for his personal use, or that if there were such rules, that they were entirely vague, unclear, and unenforced. Fumo also initially planned to call three experts regarding their experiences with the "customs and practices of the Senate," focusing specific attention on "accepted uses of staff and other resources as they comport with the Ethics Act." (Gov. Supp. App. 64).

---

U.S.C. § 3221, and we have jurisdiction pursuant to 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291.

In light of Fumo's theory of the case, the content and enforcement of the Ethics Act was clearly relevant to the Government's claim that there were rules that Fumo broke repeatedly, that those rules were clear enough for him to understand, and to show that he was deceiving the Senate when he misrepresented or omitted aspects of his actions and expenditures to avoid the perception that he had violated those rules. Without this evidence, it would have been very difficult for the Government to prove fraudulent intent. *See United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994) ("Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent."). Further, the District Court read the jury a jointly drafted instruction, both during the trial and after the closings, which emphasized that Fumo was not on trial for violating the Ethics Act, and that even a violation of the Ethics Act by itself did not imply that he defrauded or conspired to defraud the Senate. The District Court's finding that evidence related to the Ethics Act was relevant and not unfairly prejudicial was not an abuse of discretion.

Similarly, it was not an abuse of discretion for the District Court to permit John Contino, the Director of the State Ethics Commission, to testify about the Ethics Act. We have previously explained that "[w]hile it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, our Court has allowed expert testimony concerning business customs and practices." *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991). These customs and practices will sometimes include applicable legal regulations, such as registration

requirements for securities registration under the Securities Acts, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218-19 (3d Cir. 2006), or Medicaid rules, *United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006). Similarly, expert testimony may also concern ethics rules and laws related to public officials and government contractors.

Appropriately, Contino never testified as to whether Fumo himself had violated the Ethics Act, or whether he was guilty of any of the crimes with which he was charged. Contino also properly explained the Commission's disciplinary proceedings, its advisory opinions, and the annual report it publishes, which is distributed to every state legislator. This was evidence relevant to the question of whether Fumo was aware of the Senate ethics rules, and thus had an intent to defraud when he represented and omitted facts in a way that made him falsely appear to be in compliance with those rules. Part of Contino's explanation of the seriousness and mandatory nature of the rules was a description of some of the Commission's disciplinary opinions, and the penalties that were imposed for violations of the rules. The Government also properly posed questions to Contino about whether certain hypothetical facts would constitute violations of the Ethics Act—a line of questioning it had suggested in its pretrial disclosures and later pursued in light of Fumo's theory of the case.

Finally, the Government's cross-examination of Fumo on the subject of the Ethics Act was also appropriate. During direct examination, Fumo testified that "there are no rules[,]" as to his exercise of discretion regarding spending and that "there are no guidelines" as to whether staffers can do personal errands for lawmakers. (J.A. 3967). He then

24

claimed that "none of this is written down anywhere, and I think it's left up to the discretion of the senator to do that as you see fit and appropriate and as you need it." (J.A. 3967). Accordingly, in order to impeach this testimony, the Government understandably questioned Fumo about his familiarity with the annual reports of the Commission that were sent to him personally. Fumo denied ever having read the annual reports of the Commission, although he admitted being aware of them. Yet merely because this line of questioning did not turn out to be directly fruitful for the Government—although it very well may have undermined Fumo's credibility—does not mean that it was irrelevant or unfairly prejudicial. As a precaution, however, the District Court instructed the jury that Fumo was, among other things, not required to have read the annual reports.

In sum, the District Court was well within the bounds of its discretion in admitting the expert testimony of Contino and permitting the cross-examination of Fumo on the issue of the Ethics Act.

## B. Challenges to the jury's fairness and impartiality

Fumo challenges two rulings of the District Court denying his motions for a new trial on account of jurors' exposure to extraneous information, and the purported prejudice and partiality that may have resulted. We review a court's order "which denies a new trial based on alleged prejudicial information for abuse of discretion." *United States v. Urban*, 404 F.3d 754, 777 (3d Cir. 2005) (internal quotation and citation omitted). "A new trial is warranted if the defendant likely suffered 'substantial prejudice' as a result of the jury's exposure to the extraneous information." *Id*. (quoting *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001)). "In examining for prejudice, we must conduct an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." *Id.* (quoting *Lloyd*, 269 F.3d at 238 (internal quotation omitted)). Yet, the "court may inquire only into the existence of extraneous information" and not "into the subjective effect of such information on the particular jurors." *Wilson v. Vermont Castings Inc.*, 170 F.3d 391, 394 (3d Cir. 1999).

"If there is reason to believe that jurors have been exposed to prejudicial information, the trial judge is obliged to investigate the effect of that exposure on the outcome of the trial." *United States v. Console*, 13 F.3d 641, 669 (3d Cir. 1993) (internal quotation omitted). However, the court is not required to conduct an investigation where an insufficient factual basis for it exists. *Id.* Further, even if a foundation has been established for the claim, the court need not hold a hearing "at the behest of a party whose allegations if established would not entitle it to relief." *United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991). Accordingly, if the Court declines to hold a hearing, it must assume that the party seeking the hearing is able to prove that the jury was presented with extraneous information, *id.*, and determine whether "the defendant likely suffered 'substantial prejudice' as a result of the jury's exposure." *Lloyd*, 269 F.3d at 238 (internal citation omitted).

## 1. Juror 1's comments on Facebook and Twitter

Fumo argues that Juror 1's comments on Facebook and Twitter brought widespread public attention to the jury's deliberations, creating a "cloud of intense and widespread media coverage . . . and [the] public expectation that a verdict [wa]s imminent[,]" thereby violating his Sixth Amendment right to a fair and impartial trial. (Cross-App't Br. 131). Fumo also argues that the fact that Juror 1 watched the evening news, in which his own internet comments were discussed, implies or suggests that he may have been compromised by bias or partiality.

In 2009, the Judicial Conference Committee on Court Administration and Case Management published proposed model jury instructions regarding "The Use of Electronic Technology to Conduct Research on or Communicate about a Case." While the instructions focus on the importance of jurors not consulting websites or blogs to research or obtain information about the case, they also caution and instruct jurors on the use of social media:

> Before Trial:
>
>     . . . .
>
> Until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors. After you retire to deliberate, you may begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end. I hope that for all of you this case is interesting and noteworthy. I know that many of you use cell phones, Blackberries, the internet and other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends.

You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any other social networking websites, including Facebook, My Space, LinkedIn, and YouTube.

At the Close of the Case:

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, My Space, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

*Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case*, Judicial Conference Committee on Court Administration and Case Management, December 2009, *available at* http://www.uscourts.gov/uscourts/News/2010/docs/DIR10-018-Attachment.pdf (last visited August 22, 2011).

We enthusiastically endorse these instructions and strongly encourage district courts to routinely incorporate them or similar language into their own instructions. Not unlike a juror who speaks with friends or family members about a trial before the verdict is returned, a juror who comments about a case on the internet or social media may engender responses that include extraneous information about the case, or attempts to exercise persuasion and influence. If

28

anything, the risk of such prejudicial communication may be greater when a juror comments on a blog or social media website than when she has a discussion about the case in person, given that the universe of individuals who are able to see and respond to a comment on Facebook or a blog is significantly larger.

Yet while prohibiting and admonishing jurors from commenting—even obliquely—about a trial on social networking websites and other internet mediums is the preferred and highly recommended practice, it does not follow that every failure of a juror to abide by that prohibition will result in a new trial. Rather, as with other claims of juror partiality and exposure to extraneous information, courts must look to determine if the defendant was substantially prejudiced.

Here, with regard to Juror 1's posts, none of Fumo's theories of bias or partiality is plausible, let alone sufficient for us to find that the District Court abused its discretion in denying his motion for a new trial.[5] The District Court questioned Juror 1 *in camera* at length about both his comments online and his efforts to avoid media coverage of the case. The Court found no evidence that Juror 1 had been contacted regarding the posts, or that Juror 1 had been accessing media sources beyond the single incident when he accidently learned of the attention that the media and public were paying to his comments. The Court also concluded that

---

[5] Fumo also highlights the extensive media coverage that was focused on Fumo's trial in the Philadelphia media market. He suggests that the District Court did not adequately recognize or address this media attention, and too infrequently instructed the jury to avoid media coverage of the case. Yet Fumo concedes that the District Court gave such instructions on six different occasions throughout the trial, including at the beginning of *voir dire* on September 8, 2008. The District Court was well within its discretion in how it chose to instruct the jury about media exposure.

the posts on Facebook were "so opaque that there was no possible way that members of [Facebook's] Philadelphia network could read them and have any obvious understanding of his discussion." (J.A. 591). It then described the posts as "nothing more than harmless ramblings having no prejudicial effect. They were so vague as to be virtually meaningless. [Juror 1] raised no specific facts dealing with the trial, and nothing in these comments indicated any disposition toward anyone involved in the suit." (J.A. 592). We largely agree with these characterizations of the comments. Finally, the District Court found that despite violating its prohibition against discussing the details of the trial, "[Juror 1] was a trustworthy juror who was very conscientious of his duties. There was no evidence presented by either party showing that his extra-jury misconduct had a prejudicial impact on the Defendants." (J.A. 597-98).

In light of these findings, which were based in large part on Juror 1's in-person testimony and demeanor, there is simply no plausible theory for how Fumo suffered any prejudice, let alone substantial prejudice, from Juror 1's Facebook and Twitter comments. Nor does Fumo provide a plausible theory for how the fact that other jurors may have learned of Juror 1's "vague" and "virtually meaningless" comments on Facebook could have led to substantial prejudice against him. Accordingly, the District Court did not abuse its discretion when it denied Fumo's motion for a new trial on this basis.

## 2. Juror 2's exposure to excluded evidence

Three months after his conviction, Fumo's counsel alleged that Juror 2 had learned from co-workers, during the trial, about both Fumo's prior overturned conviction for hiring ghost employees, as well as the conviction of the former ISM president, John Carter, on charges of fraud. Both of these pieces of evidence had been excluded from the trial by the District Court. In contrast to allegations of bias made *during* a trial, we "are always reluctant to haul jurors in after they have reached a verdict in order to probe for potential

30

instances of bias, misconduct or extraneous influences. As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Gilsenan*, 949 F.2d at 97 (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989)). "It is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose." *Id.* at 98.

Here, the District Court rejected the foundational basis of the allegations that Juror 2 had learned of excluded evidence from co-workers. It characterized defense counsel's double-hearsay affidavit, which recounted the reporter's interviews with the jurors, as lacking the "clear, strong, substantial, and incontrovertible evidence that a specific, nonspeculative impropriety occurred." (J.A. 692). We need not address the question of whether there was sufficient foundational basis for a hearing, however, because we agree with the District Court that even if everything reported by Cipriano about what Juror 2 learned from her co-workers were true, it would not be sufficient for a showing of "substantial prejudice." We also need not determine which party has the burden of persuasion in deciding this issue, as even if the burden were on the Government to show the lack of substantial prejudice, we find that it pointed to sufficient evidence in the record for the District Court to conclude that it made such a showing.

The factors we have looked to in determining whether there was substantial prejudice include whether (1) "the extraneous information . . . relate[s] to one of the elements of the case that was decided against the party moving for a new trial," *Lloyd*, 269 F.3d at 239; (2) "the extent of the jury's exposure to the extraneous information; [(3)] the time at which the jury receives the extraneous information; [(4)] the length of the jury's deliberations and the structure of the verdict; [(5)] the existence of instructions from the court that

31

the jury should consider only evidence developed in the case[,]" *Urban*, 404 F.3d at 778 (quoting *Lloyd*, 269 F.3d at 240-41); and (6) whether there is "a heavy volume of incriminating evidence[.]" *Lloyd*, 269 F.3d at 241 (internal quotation omitted).

Here, while the fourth and to some extent the first factor weigh in Fumo's favor, they are easily overwhelmed by the second, fifth, and sixth factors, which weigh heavily against a finding of substantial prejudice. First, while knowledge of Fumo's earlier conviction had some potential for prejudice, the fact that the conviction occurred nearly thirty years prior, in 1980, as well as the fact that it was overturned, are mitigating factors. Perhaps most importantly, the fact that only one juror was exposed to a brief verbal summary of the excluded evidence from her coworkers is a compelling consideration against a finding of prejudice. *See Urban*, 404 F.3d at 778 (finding that the extent of the jury's exposure to a news article "was limited to non-existent, thus supporting the absence of prejudice" where only one juror had read the prejudicial article, and four others had "looked at the picture on the first page . . . or glanced at [its] contents"). Moreover, the District Court gave careful and repeated instructions to the jurors, including immediately before deliberation, that they should "not let rumors, suspicions, or anything else that [they] may have seen or heard outside of the court influence [their] decision in any way." (J.A. 4631). Curative instructions cannot fix every mistake, but we do generally presume that juries follow their instructions. *United States v. Liburd*, 607 F.3d 339, 344 (3d Cir. 2010). Finally, the sixth factor—the heavy volume of incriminating evidence—also weighs heavily against a finding of prejudice. The Government's case was presented over the course of three months and included an astonishing 80 witnesses. Further, as the Government accurately explains in footnote 16 of its opening brief, "Fumo testified at trial [and] admitted many of the acts alleged in the indictment, but asserted they were not criminal . . . ." (Appellant Br. 44 n.16). While many of the physical facts related to the fraud were therefore largely undisputed, the active destruction of computer records

related to the fraud provided particularly potent evidence of Fumo's motive, knowledge and intent.

In light of these factors, and even assuming that the Government had the burden of persuasion, the District Court did not abuse its discretion when it found that Juror 2's exposure to extraneous information was unlikely to have led to substantial prejudice.[6]

## III.

### Appeal of Fumo's sentence

"In sentencing a defendant, district courts follow a three-step process: At step one, the court calculates the applicable Guidelines range, which includes the application of any sentencing enhancements." *United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011) (citing *Tomko*, 562 F.3d at 567; *United States v. Shedrick*, 493 F.3d 292, 298 n.5 (3d Cir.

---

[6] Fumo's alternative argument that any exposure to potentially prejudicial extraneous information constitutes a "structural error" in the trial that requires automatic reversal is entirely unsupported and unpersuasive. The cases Fumo cites for this proposition concern a court that presented an erroneous definition of "beyond a reasonable doubt" to the jury, *Sullivan v. Louisiana*, 508 U.S. 275 (1993), and a judge who both presided over a grand jury hearing and then subsequently presided over and found guilty of criminal contempt a witness who had testified at the grand jury hearing. *In re Murchison*, 349 U.S. 133 (1955). While both concerned the right to a fair trial, they addressed very different aspects of that right, where prejudice is presumed and cannot be rebutted.

Similarly, Fumo's argument that the extraneous information violated his right to counsel and his right to confront witnesses against him also fails, as both challenges, like his challenge to the impartiality of the jury, require that there be prejudice. *United States v. De Peri*, 778 F.2d 963, 976 (3d Cir. 1985).

2007)). "At step two, the court considers any motions for departure and, if granted, states how the departure affects the Guidelines calculation." *Id.* (citing *Tomko*, 562 F.3d at 567). "At step three, the court considers the recommended Guidelines range together with the statutory factors listed in 18 U.S.C. § 3553(a) and determines the appropriate sentence, which may vary upward or downward from the range suggested by the Guidelines." *Id.* (citing *Tomko*, 562 F.3d at 567).

"Our review of a criminal sentence . . . proceeds in two stages. First, we review for procedural error at any sentencing step, including, for example, failing to make a correct computation of the Guidelines range at step one, failing to rely on appropriate bases for departure at step two, or failing to give meaningful consideration to the § 3553(a) factors at step three." *Id.* (internal citations and quotations omitted). "If there is no procedural error, the second stage of our review is for substantive unreasonableness, and we will affirm the sentence unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Id.* (quoting *Tomko*, 562 F.3d at 568) (internal quotation omitted). Here, the Government does not challenge the substantive reasonableness of either Fumo's or Arnao's sentence—it only alleges procedural error.

"The abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries." *Tomko*, 562 F.3d at 567 (citing *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Wise*, 515 F.3d 207, 217-18 (3d Cir. 2008)). "For example, an abuse of discretion has occurred if a district court based its decision on a clearly erroneous factual conclusion or an erroneous legal conclusion." *Id.* at 567-68 (citing *Wise*, 515 F.3d at 217).

Our dissenting colleague argues that the proper standard of review for the District Court's failure to arrive at a final guideline range is plain error because the Government did not object to this failure in its sentencing memoranda or at

34

the sentencing hearing. (Dissenting Op. at 2-6). However, at the July 8 sentencing hearing the Government argued the merits of and objected to Fumo's proposed departures. It also made its position clear that the District Court must first "determine whether there are grounds for departure and, if so, how many levels up or down . . . *thus reaching a final guideline range*" before "*then* . . . apply[ing] all of the 3553(a) factors, one of which, of course, is the guideline range that [the Court calculated]." (J.A. 1558) (emphasis added).

In light of these arguments, and the District Court's failure to advise the parties that it would not separately calculate a final guideline range after the completion of step two, the Government could not have foreseen that the District Court would fail to determine the extent of the departure when it pronounced its sentence. As our colleague notes, "the Government could not have objected because the decision it claims on appeal to be error had not even been made." (Dissenting Op. at 5).

Under these circumstances, including the lack of an opportunity to object to the District Court's procedures prior to its pronouncement of sentence, we conclude that the Government's substantive objections to Fumo's departure requests as well as its recitation, to the Court, of the three-step sentencing process preserve its claim for appellate review. *See United States v. Sevilla*, 541 F.3d 226, 230-31 (3d Cir. 2008) (defendant's failure to object "at close of sentencing" to the district court's neglect of sentencing procedures related to the § 3553(a) factors did not require plain error review because defendant raised the relevance of those factors in its sentencing memorandum and at the sentencing hearing, so that he was "not require[d] . . . to *re*-raise them").

Further, even if we agreed with our colleague that the plain error standard of review applied, we would nevertheless find that the District Court's failure to calculate a final guidelines range—leaving us unable to review the procedural and substantive bases of the sentence—is an error that is

plain, that affects the substantial rights of the parties, and that could "seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Vazquez-Lebron*, 582 F.3d 443, 446 (3d Cir. 2009) (internal quotation omitted); *id.* at 446-47 (finding plain error where the District Court "did not accurately follow the second and third steps of the procedure set out in [*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006)]," and thus we could not "know the District Court's intention in sentencing [the defendant]").

## A. Loss calculation

The parties dispute a number of the calculations that went into the District Court's determination of the loss attributable to Fumo's fraud. Ultimately, the District Court's decisions resulted in a loss calculation for Fumo which fell just short of $2.5 million, the threshold for increasing the offense level. "The appropriate standard of review of a district court's decision regarding the interpretation of the Sentencing Guidelines, including what constitutes 'loss,' is plenary. Factual findings, however, are simply reviewed for clear error." *United States v. Napier,* 273 F.3d 276, 278 (3d Cir. 2001) (internal citation omitted).

## 1. The Pennsylvania State Senate

### a. Overpayment of Senate employees

Fumo arranged to have a number of Senate employees under his control classified at higher salary grades than they were entitled to be based on their duties and qualifications. In order to calculate the losses attributable to this fraud, the Government reviewed the human resources manual to determine the proper classification for each employee based on testimony about the work they actually performed and then calculated the loss to the Senate as the difference between the highest salary each could possibly have been entitled to and the salary each actually received, for a total of approximately $1 million. At the sentencing hearing, Fumo did not dispute the type of work the employees actually performed or the

salaries that they actually received. Instead, he argued that the calculations were too speculative because the Chief Clerk of the Senate could not confirm them and because the Senate had failed to fire or reclassify these employees after the fact, implying that the original classifications were somehow justified. Agreeing with Fumo, the District Court excluded the Government's proposed loss altogether.

Of course, the Government bears the burden of establishing, by a preponderance of the evidence, the amount of loss. *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008). However, although "the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." *Id.* In making a loss calculation, "[t]he court need only make a reasonable estimate of the loss." *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007) (quoting U.S.S.G. § 2B1.1, Application Note 3(C)).

Here, the Government made out a prima facie case of the loss amount, and in response Fumo made only the most minimal showing of "inaccuracy" in the Government's calculations. In fact, Fumo never really challenges the substance of the Government's calculations, instead relying on surrounding circumstances to cast speculative doubt on them. Yet it is not surprising that the Chief Clerk of the Senate, who had not reviewed in detail the evidence concerning each employee's duties, declined to take a position on the stand as to the accuracy of the Government's calculations. And the Senate's decision not to reclassify certain of the employees involved could have been prompted by any manner of reasoning or purposes. Although it is possible that the Government made errors in the course of its calculations, there is no reason to think that its figure was not a "reasonable estimate" of the loss, established by a preponderance of the evidence. Accordingly, after reviewing the District Court's grounds for rejecting the Government's prima facie showing of the loss amount, we are left with "the

definite and firm conviction that a mistake has been committed." *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc) (internal quotation omitted). Further, because the difference in the loss would place Fumo into a higher offense level, the error was not harmless.

### b. Rubin's "no-work" contract

The Government next objects to the District Court's decision to exclude from the loss calculation a $150,000, five-year contract awarded to Arnao's husband Rubin, for which he purportedly performed no services. At the July 8 sentencing hearing, Fumo informed the court that he had gathered additional evidence demonstrating that Rubin had, in fact, completed work under the contract. He submitted the evidence on July 13. The additional material consisted largely of credit card bills and calendar entries, documenting that Rubin had met with people, but not what those meetings had been about. The Government argued that the evidence submitted by Fumo was weak or irrelevant, and noted that Fumo's current theory that Rubin had worked directly with Fumo and met with people on his behalf contradicted Rubin's testimony at trial, that the contract was with Rubin's company, B & R Services, for court services. The District Court declined to rule on the issue of loss from Rubin's contract, stating that "because of the complexity of the Rubin loss argument in light of the defense submissions, I felt I could not properly resolve it before sentencing. Rather than postpone the sentencing, I declined to rule on it." (Sealed App. 184-85). This was an abuse of discretion.

The Federal Rules require a Court to rule on any disputed matters at sentencing unless "a ruling is unnecessary . . . because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Fumo argues that, because the court excluded the $150,000 from its loss calculation, it did not "consider the matter in sentencing," and thus its procedure was acceptable. Yet, if "not considering [a] matter" under Rule 32(i)(3)(B) can mean refusing to resolve a matter that is part of the non-discretionary

calculation of the Guideline base offense level, then a district court could, for instance, exclude any and all losses, *simply because they are disputed*, and, consistent with 32(i)(3)(B), calculate a loss amount of $0. In fact, the District Court here effectively *did* resolve the dispute over the loss from Rubin's contract in favor of Fumo when it treated the loss as $0. It simply characterized its decision as "declin[ing] to rule on" the issue and thus requiring no reasoning on its part. A district court should not refuse to find or calculate a loss because of the complexity of the dispute or because spending the time to resolve the dispute might delay sentencing.

Fumo cites to *United States v. Cannistraro*, 871 F.2d 1210, 1215 (3d Cir. 1989), for the proposition that the court may simply refuse to determine whether a loss occurred and therefore exclude a proposed loss from the calculation. However, in *Cannistraro*, although there was a dispute over the amount of the loss ($400,000 or $3.5 million), the district court was not engaged in the non-discretionary process of calculating a Guidelines offense level based on the loss. Rather, because it was a pre-Guidelines case, *id.* at 1215 n.4, the court was exercising its broad discretion in considering the gravity of the offense as a whole and then arriving at an overall sentence, *Cunningham v. California*, 549 U.S. 270, 300 (2007) (noting the "pre-Guidelines federal sentencing system, under which well-established doctrine barred review of the exercise of sentencing discretion . . . .") (internal quotation omitted). The District Court therefore stated that "[i]t's not necessary for me to make a decision this morning as to whether it was three and a half million or whether it was 400,000." *Cannistraro*, 871 F.2d at 1215. In this case, by contrast, in order to determine the appropriate offense level under the Guidelines, and to comply with the three-step sentencing process under *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, it was necessary to definitively resolve the issue of the loss amount from Rubin's contract.

Because the Government concedes that this issue must be reviewed under the plain error standard, it must show that the error was plain, that it affected substantial rights, and, if

not rectified, that it would "seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Ward*, 626 F.3d 179, 183 (3d Cir. 2010) (internal citation omitted). The failure to resolve the disputed loss here meets all three criteria. Under *Booker* and our three-step jurisprudence, the error is clear. Further, if the District Court had found that Rubin's contract was a loss of $150,000, it would have raised the offense level of the defendant, affecting the public's substantial rights. *See United States v. Dickerson*, 381 F.3d 251, 260 (3d Cir. 2004) (district court's impermissibly lenient sentence could constitute "plain error" because "Congress's interest in imprisoning certain . . . offenders is a 'right' to which the citizenry is entitled"). Finally, if courts may simply disregard disputed losses on the grounds that they are "not considering" them, the fairness of the proceedings may be called seriously into question. Accordingly, on remand the District Court should carefully consider the evidence and make a determination as to whether, and to what extent, Rubin's contract resulted in a loss to the Senate.

## 2. Citizens Alliance

### a. Tools and equipment

The Government objects to the District Court's calculation of the losses resulting from tools and equipment purchased by Citizens Alliance but actually used by others, including Fumo.[7] The Government reviewed hundreds, perhaps thousands, of receipts and credit card statements in order to assemble a list of tools and equipment bought under the aegis of Citizens Alliance. It then compared this list

---

[7] Fumo concedes that there were some "minor" arithmetical errors in calculating the loss to Citizens Alliance, which would pin the loss at $1,077,943, rather than the $958,080 calculated by the District Court. He contends, however, that these errors were insufficient to affect his offense level. They are, however, sufficient to affect Arnao's offense level. *See* Section IV.A., *infra*.

against the inventory of Citizens Alliance and discussed with its employees whether it would ever have made any use of particular items. Finally, it assembled two charts identifying tools and equipment purchased by Citizens Alliance that it believed were used for the benefit of Fumo and his aides, though it conceded that the charts were approximate. Fumo, in testifying, reviewed the charts and denied having received roughly $50,000 worth of the approximately $130,000 in equipment on the charts. The District Court appears to have credited this assertion and reduced the loss by roughly that amount. In light of this credibility determination, we cannot say on this record that the District Court's factual finding was clearly erroneous. We therefore affirm the District Court's reduction in the loss amount attributable to the tools and equipment.[8]

**b. The Tasker Street property**

The Government sought to assess $574,000 worth of losses for rental income and unnecessary improvements to the property on Tasker Street, which Fumo induced Citizens Alliance to purchase and lavishly furnish, and then used as his Senate office with little payment from the Senate for rent or maintenance. The District Court, however, credited against that figure the fair market value of the property, which ultimately resulted in a significant credit to Fumo. The Government appeals that decision and its reasoning, and argues in the alternative that if Fumo is given credit for the

---

[8] Judge Garth disagrees that the District Court did not err. He would hold that the evidence introduced by the Government, and the exhibits that were put in evidence by the Government, detailing the cost of tools that were purchased and were used by Fumo for personal purposes ($93,409.52) should have been added to the loss calculation in full. The District Court's ruling in this regard eliminated the findings made by the jury beyond a reasonable doubt and significantly the court did not issue its own factual findings until after the sentencing hearings were over. In so doing, the Government was not able to argue that the Court's findings were clearly erroneous.

fair market value of the building, the District Court should set against it the costs of acquiring, maintaining, and improving the building.

Application Note 3(E)(i) to Section 2B1.1 of the Guidelines provides that "[l]oss shall be reduced by . . . [t]he money *returned*, and the fair market value of the property *returned* and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." (emphasis added). The use of the word "returned" signifies that for a credit to apply, the defendant must have either *returned* the very same money or property, or have provided services that were applied to the very same money, value, or property that was lost or taken during the fraud. *See also United States v. Radtke*, 415 F.3d 826, 842 (8th Cir. 2005) (noting that fringe benefits paid to defrauded employees by the defendant were "not . . . the sort of credit against loss contemplated by the guidelines" because they were "*other* benefits provided to employee-victims that do not correlate directly with the amounts withheld from the third-party administrator as part of the fraud." (emphasis in original)).

Here, the Government argues that the money or value taken was the maintenance and improvement costs as well as the rent that Fumo was not charged by Citizens Alliance as owner of the property. Fumo did not pay or refund any of the maintenance, improvements, or lost rent himself, which would have been "money returned" under Application Note 3(E). Nor did he render services related to these loses, such as assisting with the maintenance or improvements himself. The Government *did not* argue that the loss from the fraud included the funds spent by Citizens Alliance on purchasing the property. Thus, because neither that property itself nor its monetary value were ever alleged to have been taken as part of the fraud in the first place, they could not be "returned" to Citizens Alliance under Application Note 3(E) and credited against the losses.

To explain the error in the District Court's ruling in a

42

less technical way, the maintenance, improvements, and rental income the Government identified as losses were conceptually independent and collateral to any value received because of the purchase of the building. They would have been costs even if Citizens Alliance had owned the building beforehand, or even if it had been a lessee rather than owner, who subleased the space to Fumo. Fumo essentially seeks to set the value of an independent "good" he purportedly secured for Citizens Alliance against the costs his frauds inflicted on it.[9] He offers no cases in support of this theory of loss calculation, which is unsurprising, as it would allow, for instance, an officer of a corporation who embezzled from his employer to claim credits against the loss caused by the embezzlement for overall increases in the company's assets under his watch. Accordingly, we conclude that the District Court's decision to credit the value of the Tasker Street property against the losses resulting from Citizen Alliance's lost rent, improvements, and maintenance costs was an abuse of discretion.

c. **The *Gazela* painting**

Fumo induced Citizens Alliance to commission a painting of the *Gazela*, a historic ship, from a local painter for $150,000. As the Government's investigation and media reports surfaced, Fumo directed Citizens Alliance to donate the painting to the ISM, rather than retain it in his office. The Government argues that this entire amount should count as loss, because the painting was otherwise unwanted and it and its prints are now in storage. The District Court credited the testimony of an appraiser as to the value of the painting and

---

[9] Further, even if it were appropriate to grant a credit for the fair market value of the building, it would be necessary to set off the costs associated with the purchase and maintenance of the building. Obviously, any gain experienced by Citizens Alliance due to the value of the building can only be calculated after subtracting what it paid to acquire the building in the first place.

the prints and the Government does not appear to have offered a competing formal appraisal.  Accordingly, the District Court's factual finding is entitled to significant deference, and we will not disturb it.[10]

## B.  Sentencing enhancements

The Government objects to the District Court's refusal to impose a 2-level enhancement on Fumo for acting on behalf of a charitable organization and a 2-level enhancement for use of sophisticated means.  "We review a district court's application of sentencing enhancements for abuse of discretion." *United States v. Robinson*, 603 F.3d 230, 233 (3d Cir. 2010).

## 1.  Acting on behalf of a charitable organization

The Government argues that the District Court erred in failing to apply a 2-level enhancement for Fumo's misrepresentation that he was acting on behalf of Citizens Alliance, a charitable organization.  The Sentencing Guidelines state: "If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency . . . increase by 2 levels."  U.S.S.G. § 2B1.1(b)(8)(A).  The application notes make it clear that this guideline applies where an individual purports to be raising funds for a charity while intending to divert some or all the funds for another purpose.

> Subsection (b)(8)(A) applies in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable educational, religious, or political organization, or a government agency

---

[10] Judge Garth disagrees that the District Court did not err.  He would hold that the cost of the *Gazela* painting ($150,000), and the prints should be included in the loss calculation.

(regardless of whether the defendant actually was associated with the organization or government agency) when, in fact, the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain). Subsection (b)(8)(A) applies, for example, to the following:

. . . .

(iii) A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

U.S.S.G. § 2B1.1, Application Note 7(B). The Government contends that Fumo's behavior fits squarely into this guideline because Fumo acquired funds from PECO for Citizens Alliance while intending to divert those funds for his own use. Fumo argued and the District Court agreed that the Government had not shown Fumo's intent to divert the funds at the time he obtained them from PECO. However, the Government points out that Fumo acquired a substantial portion—$10 million—of the PECO funds in 2002, well after he began using Citizens Alliance's funds for his own personal political benefits. Indeed, it strains all credulity to believe that Fumo repeatedly used Citizens Alliance funds for personal and political purposes, then withdrew his intent to do so at the time he obtained the $10 million from PECO, then regained that intent shortly thereafter as he continued to use Citizens Alliance funds for his own benefit. This evidence of Fumo's intent to divert the funds was overwhelming, and the District Court's refusal to apply a 2-level enhancement was an abuse of discretion.

## 2. Use of sophisticated means

The Government next argues that the District Court erred in not applying a 2-level enhancement for the use of sophisticated means. The Sentencing Guidelines state: "If . . . (C) the offense otherwise involved sophisticated means, increase by 2 levels." U.S.S.G. § 2B1.1(b)(9)(C). As the explanatory note 8(B) amplifies, "'[s]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of *fictitious entities, corporate shells*, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1, Application Note 8(B) (emphasis added). "Application of the adjustment is proper when the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011) (internal quotation omitted); *see also United States v. Frank*, 354 F.3d 910, 928 (8th Cir. 2004) (enhancement appropriate where defendants "use[d] other individuals and businesses to conduct business on [a defendant's] behalf," as well as a "shell entity"); *United States v. Cianci*, 154 F.3d 106, 110 (3d Cir. 1998) (finding "sophisticated means" enhancement appropriate where defendant's crime "involved the use of a shell corporation [and] falsified documents").

Here, the District Court rejected the Government's request for a sophisticated means enhancement for the "reasons substantially based upon defense arguments." (Sealed App. 184). Fumo had argued that the conduct here was not "*especially* complex or intricate, relative to other federal criminal fraud cases" under U.S.S.G. § 2B1.1(b)(9)(C). (J.A. 715) (emphasis in original). Yet Fumo induced Citizens Alliance to form for-profit subsidiaries in order to permit purchases on his behalf without the disclosures required for such entities. According to the evidence, these subsidiaries did no business of their own, and at least some of their directors were "recruited" by being asked to sign documents the significance of which they did not understand. These subsidiaries leased cars for Fumo and paid at least one political consultant for work on a campaign

46

Fumo had a political interest in. In its memorandum and order denying Fumo's post-trial motion for acquittal, the District Court itself characterized the entities as:

> nothing more than sham corporations designed to hide the activities of Citizens Alliance that were not in conformity with its status as a 501(c)(3) corporation, such as the purchase of the cars for the personal use of Fumo and his staff. In a March 23, 2000 memorandum from Arnao to Fumo, Arnao revealed that the two were working in close conjunction to create these sham corporations, with false corporate addresses and purely titular officers.

(J.A. 507). The use of these sham entities, which were created to conceal the flow of funds to Fumo and his associates, strongly resembles the conduct described in Application Note 8(B) as well as conduct that this Court and others have found to fall within the sophisticated means guideline. Here too, we conclude that the District Court abused its discretion in refusing to apply the enhancement.

## C. Calculation of the final guidelines range

The Government next argues that the District Court made a fundamental procedural error in the second step of the sentencing process when, after granting Fumo a departure based upon his extraordinary public works, it did not calculate a new, final guidelines range. As we have repeatedly made clear "[c]ourts *must* continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*[;] [i]n doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation." *Gunter*, 462 F.3d at 247 (emphasis added) (internal quotations and citations omitted); *see also United States v. Lofink*, 564 F.3d 232, 238 (3d Cir. 2009).

Fumo initially sought a departure based on his health

47

and his "good works" (i.e., his public service). The District Court ultimately awarded him a significant reduction from the guidelines sentencing range of 121 to 151 months that it had calculated at step one. Whether this reduction was ultimately a departure under the Guidelines or a variance under § 3553(a) is itself a contested issue discussed in more detail below. However, at the time the sentence was announced in the courtroom, it appeared that it was a departure. At the July 14 final sentencing hearing, the Court stated: "I have considered what the guidelines have said here and I did make a finding as to what the guidelines are, but I've also added a finding that I'm going to depart from them." (J.A. 1623). Nevertheless, the District Court never actually stated what that departure was in terms of the guidelines range; a fact the parties noticed.

In his post-sentencing Rule 35(a) motion, seeking to have the Court deem its sentence a variance instead of a departure, Fumo noted that "[w]hen a sentencing court grants a true 'departure' [as opposed to a variance,] it must state how the departure affects the Guidelines calculation. *This Court[] fail[ed] to make such a statement . . . .*" (J.A. 1629) (emphasis added) (internal quotation omitted). While opposing that motion, the Government noted that the court had initially established a "baseline" (i.e., before the resolution of the motion for a departure based on good works) offense level of 33—although later changed to 32—but carefully took no position on whether the court had ever announced a final guideline offense level.

In ruling on the Rule 35(a) motion, the Court held: "The government correctly states that the court announced it was granting a departure. Thereafter, the court never announced the guideline level to which it departed, and, in fact, never reached the sentence it did by consulting any specific level on the guideline chart." (J.A. 1653). Then, in an amendment to the judgment accompanying its ruling, the court stated, "I never announced nor have I ever determined to what guideline level I had departed." (Sealed App. 185-86).

48

Fumo attempts to argue that the Court adequately completed step two simply by sentencing Fumo to the sentence it did—i.e., that reducing Fumo's sentence by a certain number of months implies what the degree of the departure was. However, the only case that Fumo cites to for the proposition that announcing a departure in terms of months rather than in terms of offense levels and guidelines ranges is *United States v. Torres*, 251 F.3d 138 (3d Cir. 2001), a pre-*Booker* case. Such an approach would make little sense under the post-*Booker* sentencing procedure described in *Gall*. Offense levels, cross-referenced with the criminal history of the defendant, now result in a *recommended* range of months incarceration, and the court must then exercise its discretion under § 3553(a) to determine where—whether inside or outside of that range—the sentence should fall. If after step one the court simply decides on a final sentence without separately completing the second (i.e., departures that change the Guidelines range) and third steps (i.e., variances that determine the final sentence), it becomes impossible for an appellate court to reconstruct its logic and reasoning, and therefore to review the sentence. As we note below, this is no idle worry and precisely what occurred here.

As a result, to the extent the District Court's sentencing reduction was a departure rather than a variance under § 3553(a), it erred by failing to calculate a final guideline offense level and guidelines sentencing range.

## D. Articulation of the basis for the below-guidelines sentence related to public service

The Government argues that the District Court further erred by failing to clearly articulate whether it was granting Fumo a departure or a variance, and that this error requires remand. There are "two types of sentence that diverge from the original Guidelines range . . . . A traditional sentencing 'departure' diverges . . . from the originally calculated range 'for reasons contemplated by the Guidelines themselves.' In contrast, a 'variance' diverges . . . from the Guidelines,

49

including any departures, based on an exercise of the court's discretion under § 3553(a)." *United States v. Floyd*, 499 F.3d 308, 311 (3d Cir. 2007) (internal citations omitted). This distinction is more than mere formality. "Although a departure or a variance could, in the end, lead to the same outcome . . . it is important for sentencing courts to distinguish between the two, as departures are subject to different requirements than variances." *Id.* "[D]istrict courts should be careful to articulate whether a sentence is a departure or a variance from an advisory Guidelines range." *United States v. Vampire Nation*, 451 F.3d 189, 198 (3d Cir. 2006).

When a district court's sentencing decision "leaves us unable to determine whether the court intended to grant [a] . . . departure or a variance," the court has not, as it must, "adequately explain[ed] the chosen sentence." *United States v. Brown*, 578 F.3d 221, 226 (3d Cir. 2009) (internal quotation omitted). Under such circumstances, "we will remand for resentencing unless we conclude on the record as a whole . . . that the error did not affect the district court's selection of the sentence imposed." *Id.* (internal quotation omitted). Therefore, the Government must establish first, that it is impossible to determine with confidence from the record whether the District Court granted a departure or a variance based on Fumo's good works; and second, that the error affected the District Court's selection of its sentence.

Before the July 8 hearing, Fumo moved for a departure based on both good works and ill health. In its July 9 ruling, the District Court denied the request for a departure based on ill health, but stated that "a decision on a departure based upon good works will be reserved until . . . July 14, 2009." (J.A. 1566). At the July 14 hearing, the Court initially noted that "I did not deny with regards to the good works." (J.A. 1568). Later on in the hearing, the court announced, "You worked hard for the public . . . and I'm therefore going to grant a departure from the guidelines." (J.A. 1622). Finally, the court stated, "I did make a finding as to what the guidelines are, but I've also added a finding that I'm going to

depart from them." (J.A. 1623).

Shortly after the hearing, in response to Fumo's Rule 35(a) motion to "correct" the sentence to establish that the sentencing reduction was a variance rather than a departure, the District Court issued an order stating that "[t]he government correctly states that the court announced it was granting a departure. Thereafter, the court never enunciated the guideline level to which it departed, and, in fact, never reached the sentence it did by consulting any specific level on the guideline chart." (J.A. 1653). The District Court then attached an amendment to the judgment, which included the following passage:

> I next determined whether there should be a departure from the guidelines and announced at the sentencing hearing that there should be based on my finding extraordinary good works by the defendant. I did not announce what specific guideline level the offense fell into; that is to say, the precise number of levels by which I intended to depart because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines.

> Having advised counsel of the offense level that I found and my intent to depart downward, I then proceeded to hear from counsel their respective analyses of what an appropriate sentence should be.

> *The procedure I followed was perhaps more akin to that associated with a variance than a downward departure because I never announced nor have I ever determined to what guideline level I had departed.* Ultimately, the argument over which it was elevates form over substance.

51

(Sealed App. 185-86) (emphasis added). Without the amendment to the judgment, we might have been satisfied that the Court was departing rather than varying. However, the statement in that document that "[t]he procedure I followed was perhaps more akin to that associated with a variance than a downward departure" indicates that the District Court itself was not certain whether it was departing or varying.

This conclusion is reinforced by the District Court's earlier statement in the same filing that "I did not announce what specific guideline level the offense fell into; that is . . . the precise number of levels by which I intended to depart because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines." (Sealed App. 186). This language uses "depart" and "vary" interchangeably and admits that the Court conflated and combined the second and third steps of the sentencing process. The District Court did not need to "consider . . . all other sentencing factors" under § 3553(a) before departing to a different guideline level, nor was it appropriate to do so.

We have previously responded to the District Court's criticism that the distinction between departures and variances "elevates form over substance" by noting that "in the sentencing context, it is firmly established that form—*i.e.* procedure—and substance are both of high importance." *Wright,* 642 F.3d at 154. "We have a responsibility 'to ensure that a substantively reasonable sentence has been imposed *in a procedurally fair way.*'" *Id.* (emphasis added) (quoting *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008)). Moreover, the difference here may be more than a mere formality, given the different scrutiny and standards of review we apply to departures as opposed to variances. In particular, our precedent places certain limitations on courts' abilities to depart based on good works in the case of public officials. *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (holding that "if a public servant performs civic and charitable work as part of his daily functions, these should not

52

be considered in his sentencing because we expect such work from our public servants" but that "assistance, in time and money, to individuals and local organizations" that would not ordinarily be part of a defendant's work as a public servant may properly be considered). While we need not decide whether a departure based on good works could be applied here, it is undeniable that a district court has more discretion in imposing a variance, where the substance of the sentence is only subject to substantive reasonableness review.

Because of the substantial uncertainty regarding whether the District Court's reduction was a departure or variance, and because that distinction could very well have practical effects on Fumo's ultimate sentence, we cannot conclusively say based on the record as a whole that "the error did not affect the district court's selection of the sentence imposed." *Brown*, 578 F.3d at 226. Accordingly, on remand the District Court should take care to first address any departures, and if departures are granted, to then calculate a final guidelines range. Taking this final guidelines range as advisory, it should only then consider the sentencing factors included in 18 U.S.C. § 3553(a), decide whether to vary from the guidelines, and determine the appropriate sentence.

## E. Consideration of the Government's arguments for an upward variance

After learning that the Court proposed to depart downwards, the Government moved for an upward variance, arguing that the proposed sentence did not adequately represent or take into account the full loss from the fraud, the damage to public institutions, Fumo's perjury at trial, other obstructive conduct, and Fumo's alleged lack of remorse. The District Court did not vary upwards on any of these bases. At the hearing, the Government also raised the disparity between the sentence imposed on Fumo and other sentences imposed for fraud involving public and charitable funds, as well the disparity between Fumo's sentence and

those imposed on his accomplices in the scheme.[11]

In setting forth how a court should respond to a party's request for a variance, the Supreme Court has held that "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). "[T]he court must acknowledge and respond to any properly presented sentencing argument which has colorable legal merit and a factual basis." *United States v. Ausburn*, 502 F.3d 313, 329 (3d Cir. 2007). Nevertheless, we need not address this argument now, in light of the fact that some or many of the Government's arguments may become moot after the District Court recalculates the guideline range and rules on the parties' motions for departures. On remand, the District Court should consider any colorable arguments for a variance that have a basis in fact, whether made by Fumo or the Government.

## F. Prejudgment interest on the order of restitution

Finally, Fumo also challenges one aspect of his sentence, raising two arguments for why prejudgment interest on the restitution awarded was an abuse of discretion.

First, although we previously affirmed an award of prejudgment interest on a restitution award in *Gov't of Virgin Islands v. Davis*, 43 F.3d 41, 47 (3d Cir. 1994), Fumo argues that *Davis* has been overturned *sub silentio* by our decision in *United States v. Leahy*, 438 F.3d 328, 333-35 (3d Cir. 2006)

---

[11] In particular, John Carter, the former President of the ISM, was sentenced to a term of 15 years' imprisonment. Computer technician Leonard Luchko, who was only involved with the obstruction of justice portion of the case, received a sentence of 30 months' imprisonment. Computer technician Mark Eister, who cooperated with the Government, received a 5K1.1 departure and was sentenced to probation.

(en banc). In *Davis,* we noted that as a general matter, it is "well established that criminal penalties do not bear interest." 43 F.3d at 47 (internal citations omitted). However, we also held that the inclusion of prejudgment interest on restitution under the Victim and Witness Protection Act ("VWPA"), as amended by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663(b)(1), was proper because the "restitution ordered . . . is compensatory rather than punitive" and the "[VWPA] [a]wards are designed to compensate victims for their losses, rather than to serve retributive or deterrent purposes." 43 F.3d at 47 (internal citation omitted). Given that the restitution ordered here was awarded under the VWPA, it would seem that prejudgment interest is appropriate under *Davis*.

Fumo argues that in *Leahy*, which determined whether *United States v. Booker* applied to orders of restitution, we concluded "that restitution ordered as part of a criminal sentence is criminal rather than civil in nature" and expressly agreed with three other circuits who we characterized as holding "that restitution, when ordered in connection with a criminal conviction, is a criminal penalty." 438 F.3d at 334-35. Thus, Fumo argues, because restitution is a "criminal penalty," under *Davis*'s own terms prejudgment interest should be unavailable. The underlying tension is that restitution, unlike a criminal fine on the one hand, or compensatory damages, on the other, serves *both* punitive purposes and compensatory ones. Indeed, in *Leahy* we framed our analysis by noting "that restitution combines features of both criminal and civil penalties, as it is, on the one hand, a restoration to the victim by defendant of ill-gotten gains, while it is, at the same time, an aspect of a criminal sentence." 438 F.3d at 333. The question then arises, which dictate should courts follow: that a criminal penalty should not bear interest, *Rodgers v. United States*, 332 U.S. 371, 374 (1947), or that a victim who has suffered actual money damages at the hands of a defendant should be fairly compensated for the loss, *id.* at 373, in situations where both principles are applicable.

In *Rodgers*, a cotton farmer produced and sold more cotton than his quota permitted under the Agricultural Adjustment Act of 1938, and the United States sued to recover "money 'penalties'" that the Act made the farmer subject to. *Id.* at 372. The District Court awarded interest on the approximately $7,000 from the dates the penalties became due to the date of judgment. The Sixth Circuit affirmed, and the Supreme Court reversed. The Supreme Court first affirmed the general rule that "the failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest." *Id.* at 373. In this particular case, however, the Court analogized the penalties to criminal penalties, and noted:

> [t]he contention is hardly supportable that the Federal Government suffers money damages or loss in the common law sense, to be compensated for by interest, when one convicted of a crime fails promptly to pay a money fine assessed against him. The underlying theory of that penalty is that it is a punishment or deterrent and not a revenue-raising device; unlike a tax, it does not rest on the basic necessity of the Government to collect a carefully estimated sum of money by a particular date in order to meet its anticipated expenditures.

*Id.* at 374. According to *Rodgers* then, it is the absence of "money damages or loss . . . to be compensated for" and the lack of authority for "revenue-raising" that makes prejudgment interest inapplicable to criminal penalties.

Yet in the context of restitution under the VWPA, there are money damages and losses to be compensated. Further, as courts have widely agreed, there is authority to seek "carefully estimated sum[s] of money", *id.*, for victims under the VWPA, as its "purpose . . . is to ensure that wrongdoers, to the degree possible, make their victims

whole." *United States v. Rochester*, 898 F.2d 971, 983 (5th Cir. 1990) (quoting *United States v. Hughey*, 877 F.2d 1256, 1261 (5th Cir. 1989) (collecting cases), *rev'd on other grounds*, 494 U.S. 411 (1990)). And in order to make a victim whole, prejudgment interest may be necessary to "allow an injured party to recoup the time-value of his loss." *William A. Graham Co. v. Haughey*, --- F.3d ---, 2011 WL 1833238, at *5 (3d Cir. May 16, 2011). Other circuits have reached the same conclusion that we reached in *Davis*, finding that prejudgment interest is available on orders of restitution under the VWPA and MVRA. *See United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011); *United States v. Huff*, 609 F.3d 1240, 1247 n.4 (11th Cir. 2010); *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994); *United States v. Patty*, 992 F.2d 1045, 1049-50 (10th Cir. 1993); *United States v. Simpson*, 8 F.3d 546, 552 (7th Cir. 1993); *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991); *Rochester*, 898 F.2d at 982-83.

Moreover, in *Leahy*, our characterization of restitution as a criminal penalty came in the context of whether it was the type of award to which the Sixth Amendment right to a jury trial applied. For purposes of our Sixth Amendment analysis in *Leahy*, it was constitutionally irrelevant whether restitution under the VWPA *also* has an important, and indeed primary purpose of compensating victims. While *Leahy* shows that restitution under the VWPA has a punitive component that makes it a criminal penalty in the eyes of the Sixth Amendment, that does not modify our ruling in *Davis* that such restitution also serves an important compensatory purpose under the VWPA, which permits courts to award prejudgment interest in order to recoup the time-value of the victim's loss. Accordingly, we reaffirm our holding in *Davis* that prejudgment interest is available for orders of restitution under the VWPA and MVRA.

Fumo also argues that the Government, when it obtained prejudgment interest on the restitution after the date of sentencing, did not give the proper 10 days' notice that it would need more time to ascertain the amount of loss under

57

18 U.S.C. § 3664(d)(5).  Section 3664(d)(5) reads:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

On its face this language does seem to suggest that the Government should provide prejudgment interest calculations before sentencing or give 10 days' notice that it will need more time to make and present such calculations.  However, the Fourth Circuit, in *United States v. Johnson*, 400 F.3d 187, 199 (4th Cir. 2005), noted that other circuits have concluded, based on the statute's purpose in protecting victims, that the 90-day "deadline" for determining the victim's losses does not bar a court from ordering restitution even after 90 days as long as there is no substantial prejudice to the defendant.  This holding has since been affirmed by the Supreme Court.  *Dolan v. United States*, 130 S. Ct. 2533, 2539 (2010) (a court's failure to meet the statute's 90-day deadline for restitution, "even through its own fault or that of the Government, does not deprive the court of the power to order restitution").  *Johnson* also held, in light of the treatment of the 90-day deadline, that the 10-day deadline for the Government to provide notice of the need to further ascertain the victim's loss was similarly no bar to the Court postponing or modifying restitution.  400 F.3d at 199.  We agree with *Johnson* and see no reason to distinguish between the 10-day deadline at issue here and the 90-day deadline in the same provision that the Supreme Court in *Dolan* held creates a non-enforceable deadline for district courts.  We will therefore affirm the order of restitution, including prejudgment interest.

## IV.

### Appeal of Arnao's sentence

58

## A. Loss calculation

The Government argues that, as it did for Fumo, the District Court erred in calculating the loss that Arnao's fraud caused to Citizens Alliance.

Arnao joins in Fumo's arguments with respect to the Citizens Alliance fraud, which is the only portion of Fumo's fraudulent conduct in which she is implicated. The District Court's calculations of those losses and our review of them affect her sentence as well. Arnao agrees with Fumo's analysis of the Citizens Alliance loss, which calculated the loss at $1,077,943, rather than the $958,080 calculated by the District Court. In addition, as explained above, the District Court abused its discretion in crediting the value of the Tasker Street property against the losses from maintenance, improvements, and foregone rent. The approximately $574,000 loss from that portion of the Citizens Alliance fraud is also attributable to Arnao. Because these revised calculations create a loss that is greater than $1,000,000, Arnao will receive a 2-level increase in her base offense level under § 2B1.1(b)(I). Accordingly, these errors were not harmless as to Arnao and her sentence must be vacated and remanded.

## B. Procedural reasonableness of the downward variance

Although we vacate and remand Arnao's sentence for consideration of the proper loss amount from the fraud, we also address the Government's argument that we should vacate Arnao's sentence because the District Court failed to adequately explain its reasons for granting Arnao a substantial downward variance from the advisory guideline range. With regard to whether a court's explanation of a sentence demonstrates that it meaningfully considered the § 3553(a) factors, we have stated that "[b]ecause of the fact-bound nature of each sentencing decision, there is no uniform threshold for determining whether a court has supplied sufficient explanation for its sentence." *United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010) (internal quotation

omitted).  For some cases, a brief statement will be sufficient, while for others a more extensive explanation of the court's reasoning may be needed.  *Id.*  However, the greater the magnitude of a court's variance, the greater the burden on the district court to describe its reasoning.  *Id.* at 216.

Here, despite the Government's claims to the contrary, the District Court did consider the relevant statutory factors and the arguments presented to it at sentencing.  For the most part, the Government's true concern with the sentence appears to be that the District Court did not agree with it on the substance.  In its initial brief, for instance, the Government argues that the variance was erroneous because it relied primarily on Arnao's difficult childhood.  This is a *substantive* criticism, not a procedural one.  Later, in its reply brief, the Government admits that the District Court also considered Arnao's charitable good works, but contends that these good deeds cannot support a large variance.  This, again, is a *substantive* criticism, not a procedural one.  *See, e.g.*, *id.* at 217 (rejecting Government's argument, which was framed as procedural, that the district court did not adequately consider defendant's criminal history or the seriousness of the offense because it "is a substantive complaint, not a procedural one" ).

To the extent its argument is based on alleged procedural deficiencies, the Government appears to argue that the District Court had a duty to address every single permutation of its arguments, counter-arguments and replies.  But we have never required such pinpoint precision in addressing statutory sentencing arguments, and have emphasized that review "is necessarily flexible."  *Id.* at 215 (quoting *Ausburn*, 502 F.3d at 328).  The Government cites three examples of sentences that we have overturned on grounds of procedural unreasonableness: *Id.* at 217-20, *United States v. Lychock*, 578 F.3d 214, 219 (3d Cir. 2009), and *Levinson*, 543 F.3d at 199-200.  However, each of these involved a sentencing court that varied from the Guidelines because of a policy disagreement under *Kimbrough v. United States*, 552 U.S. 85 (2007), but without sufficiently

explaining the reasoning behind that policy disagreement.

In this case, it is true that there was some hint of the District Court's disagreement with the way the Guidelines treat corruption cases. Nevertheless, the District Court did not suggest that this was an actual basis for its variance. Rather, its decision to vary appears to have been based upon the considerations of the statutory § 3553(a) factors. In sum, we find that the District Court's explanation of the variance is sufficiently thorough to demonstrate that it fully considered the Government's arguments and the various statutory factors. It was also specific and reasoned enough to permit us to exercise meaningful appellate review. Accordingly, we find no abuse of discretion in the Court's downward variance.[12]

---

[12] Judge Garth disagrees with this conclusion and would hold that the District Court abused its discretion in granting the large downward variance it granted to Arnao. A "major variance from the Guidelines requires a more significant justification than a minor one." *United States v. Grober*, 624 F.3d 592, 599 (3d Cir. 2010). In this case, the District Court imposed a sentence of only 12 months and one day, based on a calculated guideline range of 70-87 months. Other than its conclusory statement that Arnao's challenges were "unusual from the usual challenge" and its nod to the fact that she "did something in [her] lifetime to help other people, to help other charities," the District Court provided little explanation for the sizeable downward variance it granted.

The District Court additionally failed to address, much less give meaningful consideration to, several of the Government's arguments—for example regarding Arnao's egregious obstruction efforts and the reputational harm to Citizens Alliance. Finally, the District Court provided an inadequate explanation in regards to considering unwarranted disparities under § 3553(a)(6). "[A] district court's failure to analyze § 3553(a)(6) may constitute reversible procedural error, even where . . . the court engages in thorough and

## V.

For the foregoing reasons, we affirm Fumo's conviction, vacate the sentences of both Fumo and Arnao, and remand for further proceedings not inconsistent with this opinion.

---

thoughtful analysis of several other sentencing factors." *Merced*, 603 F.3d at 224.

A sentence may be procedurally improper where it is "imposed without considering the risk of creating unwarranted disparities and the sentence in fact creates such a risk," especially where, as here, "the sentence falls outside of the Guidelines, or where . . . a party specifically raises a concern about disparities with the district court and that argument is ignored." *Id.* The District Court in this case largely ignored the Government's disparity arguments, and instead concluded, without explanation, that the guideline sentence would "result in a tremendous disparity."

Under these circumstances, Judge Garth would hold that the District Court failed to meet its burden of providing a sufficient explanation for Arnao's variance. *See id.*, 603 F.3d at 216. Therefore, the variance ordered by the District Court was an abuse of discretion.

*United States of America v. Vincent J. Fumo,*
Nos. 09-3388 & 09-3389
*United States of America v. Ruth Arnao,* No. 09-3390

NYGAARD, J., concurring in part and dissenting in part.

I agree with the majority and join them in affirming Fumo and Arnao's convictions. I do, however, have two specific points of disagreement that cause me to dissent. First, the majority today vacates the sentencing decision of an experienced District Court judge because they claim, *inter alia*, he failed to recalculate the advisory Guidelines range after granting Fumo a downward departure. Without such a recalculation, the majority contends that it cannot reconstruct the District Court's logic and reasoning and, therefore, finds it impossible to review the sentence. Although I question whether such a recalculation is even necessary, my reading of the record reveals that the District Judge did indeed recalculate the advisory Guidelines range after granting the downward departure.[1] Second, I believe the majority employs an incorrect standard to review this issue.

---

[1] My dissenting opinion will be confined to my disagreement with their finding of procedural error as to the District Court's departure ruling and Guidelines calculation. I also dissent from those portions of the majority opinion that find the District Court's classification of loss to be an abuse of discretion. I further disagree with the majority and cannot find the District Court's refusal to apply sentencing enhancements for acting on behalf of a charity (U.S.S.G. § 2B1.1(b)(8)(A)) and for the use of sophisticated means (U.S.S.G. § 2B1.1(b)(9)(C)) to be an abuse of discretion. Because I dissent from the majority's resolution of the loss

1

I.

A.

Quoting our opinion in *United States v. Tomko*, the majority states that "[t]he abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries." 562 F.3d 558, 567 (3d Cir. 2009) (en banc) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). That is a correct statement, as far as it goes. What the majority misses, however, is that "[o]ur standard of review differs based on whether the alleged sentencing error was raised below. If so, we review for abuse of discretion; if not, we review for plain error." *United States v. Russell*, 564 F.3d 200, 203 (3d Cir. 2009); *see also United States v. Vazquez–Lebron,* 582 F.3d 443, 445 (3d Cir. 2009) (holding that failure to raise procedural error before the district court resulted in plain error review); *United States v. Watson,* 482 F.3d 269, 274 (3d Cir. 2007) ("[b]ecause [the defendant] did not object to this sentence on this ground during the sentencing hearing, we review the District Court's judgment for plain error."). Indeed, there was no question in *Tomko* that the appellant preserved its challenge to the issue under review: "[a]t the sentencing proceeding, the Government exhaustively

---

calculation issues, I dissent from that portion of the majority opinion that vacates Arnao's sentence as well. I join Judge Fuentes, however, in finding no abuse of discretion in the District Court's loss calculations concerning the tools and equipment purchased by Citizen's Alliance (Maj. Op. at 39) and the painting of the sailing vessel, *Gazela* (Maj. Op. at 42). Finally, I join Judge Fuentes, and find no abuse of discretion with the District Court's grant of variances to Arnao.

asserted, directly in front of the District Court, that a probationary sentence would adversely affect general deterrence." 562 F.3d at 568.

Even though the majority acknowledges that the Government "carefully took no position on whether the court had even announced a final guideline offense level," it incorrectly defaults to the "abuse of discretion" standard of review. Maj. Op. at 47. Review for "plain error" is, instead, the appropriate standard of review because, despite ample opportunity to do so, the Government did not object to the District Court's failure to perform a post-departure sentencing recalculation.

Our authority to remedy an improperly preserved error is strictly circumscribed.[2]  Federal Rule of Criminal Procedure 52(b), as well as recent Supreme Court precedent, sets forth the proper standard of review applicable to unpreserved procedural sentencing errors: when a party does not preserve an argument in the district court, we review only for plain error. Rule 52(b) provides that, in the absence of proper preservation, plain-error review applies. *See*

---

[2] As the Supreme Court has noted, there is good reason our review is circumscribed: "anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error could be fatal." *Puckett v. United States*, 556 U.S. 129, ---, 129 S.Ct. 1423, 1428 (2009) (quoting *United States v. Padilla*, 415 F.3d 211, 224 (1st Cir. 2005) (en banc) (Boudin, C. J., concurring)).

3

FED.R.CRIM.P. 52(B). To establish plain error, the appealing party must show that an error (1) was made, (2) is plain (i.e., clear or obvious), and (3) affects substantial rights. *United States v. Lessner*, 498 F.3d 185, 192 (3d Cir. 2007). Even if an appellant makes this three-part showing, an appellate court may exercise its discretion to correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993).

The Supreme Court has specifically held that appellate courts can review unpreserved claims for plain error only. *United States v. Olano*, 507 U.S. at 731. The Supreme Court has recently again instructed that, "[i]f an error is not properly preserved, appellate-court authority to remedy the error ... is strictly circumscribed" to plain-error review. *Puckett v. United States*, 556 U.S. 129, ---, 129 S.Ct. 1423, 1428 (2009). Applying plain-error review in the sentencing context "serves worthy purposes," including "induc[ing] the timely raising of claims and objections" to give the District Court an opportunity to correct error, if error there be. *See Id.* at 1428, 1433. Indeed, in *United States v. Booker*, the Supreme Court instructed that we are to "apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test" when reviewing sentences. 543 U.S. 220, 268 (2005).

The Federal Rules expressly provide that "[a] party may preserve a claim of error by informing the court-*when the court ruling or order is made or sought*-of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." FED.R.CRIM.P. 51(b) (emphasis added). Furthermore, the

4

"objection must be specific enough not only to put the judge on notice that there is in fact an objection, but to serve notice as to the underlying basis for the objection." *United States v. Russell*, 134 F.3d 171, 179 (3d Cir. 1998). Here, the Government's sole request at the end of the sentencing hearing was for a formal determination on prejudgment interest as it affects restitution. J.A. 1625. Nor did the Government avail itself of the opportunity to challenge the District Court's sentencing calculations by filing a Rule 35(a) motion post-sentencing. It did file a response to Fumo's Rule 35(a) motion, but failed to raise the issue, despite acknowledging that such motions can be used to attack technical errors that might otherwise require remand. J.A. 1635-36. *See United States v. Miller*, 594 F.3d 172, 182 (3d Cir. 2010). Neither of these actions preserved the Government's objections nor put the District Court on notice that the Government perceived a problem with its sentencing calculations post-departure.

The Government contends that it challenged the District Court's failure to undertake a post-departure recalculation in its sentencing memoranda and at the sentencing hearing. Government's Opening Brief at 4. There is no such challenge in the record. Neither in its own sentencing memoranda nor in its response to Fumo's Rule 35(a) motion does the Government object to the failure to recalculate post-departure. The portion of the transcript the Government points to in its brief (J.A. 1558) is not an objection. Aside from the Government's criticism of our opinion in *Gunter*, *infra.*, this transcript portion is merely a discussion with the District Court regarding the application of departures or variances generally. I cannot find an objection to the District Court's departure or its perceived failure to

5

recalculate a Guidelines range noted there. And, of course, the Government could not have objected because the decision it claims on appeal to be error had not even been made. It is obvious to me why the Government did not object: it thought then, as I think now, that the District Court did not err.[3]

I further note that the Government has argued for plain error review time after time in situations where a *defendant* fails to object to a procedural error. *See, e.g., United States v. Reevey*, 631 F.3d 110, 112 n. 3 (3d Cir. 2010); *United States v. Bradica*, No. 09-2420 (Government's Brief); *United States v. Bagdy,* No. 08-4680 (Government's Brief); *United States v. Swift*, No. 09-1985 (Government's Brief). The government knows the rules and cannot have it both ways, arguing for plain error review when the defendant fails to object and abuse of discretion when it slips up. Although I would

---

[3] The majority's reliance on our decision in *United States v. Sevilla,* 541 F.3d 226 (3d Cir. 2008) provides them no cover. In *Sevilla*, we stated that "'[a]n objection to the reasonableness of the final sentence will be preserved if, during sentencing proceedings, the defendant properly raised a meritorious factual or legal issue relating to one or more of the factors enumerated in 18 U.S.C. § 3553(a).'" *Id.* at 231 (quoting *United States v. Grier*, 475 F.3d 556, 571 n. 11 (3d Cir.2007) (en banc)). But *Sevilla* is readily distinguishable on its facts. In *Sevilla*, the defendant-appellant had raised his legally recognized grounds for downward variance in a written sentencing memorandum prior to the sentencing hearing. 541 F.3d at 231. The Government here never raised the issue of the lack of a post-departure recalculation before sentencing or afterward.

employ plain error review, I will meet my majority colleagues where they stand and review this issue for an abuse of discretion.

B.

The majority faults the District Court's application of step two of the *Gunter* analysis. Specifically, my colleagues fault the District Court for failing to announce a final Guidelines sentencing range after granting a departure and for failing to clearly articulate whether it was granting Fumo a departure or a variance. Maj. Op. at 49. I disagree with them on both points.

My reading of the record leaves me with no doubt as to the District Court's decision or its reasoning: Judge Buckwalter granted Fumo a departure under § 5H1.11 for his good works. Fumo specifically moved for a departure on two fronts: his ill health and his good works. The District Court specifically denied his request to depart for ill health, but granted him a departure for his good works: "You worked hard for the public . . . and I'm therefore going to grant a departure from the Guidelines." J.A. 1622. Judge Buckwalter reaffirmed this ruling by commenting "I did make a finding as to what the Guidelines are, but I've also added a finding that I'm going to depart from them." J.A. 1623.

The District Court clarified its ruling even further after sentencing. Fumo filed a motion to clarify his sentence, given that Judge Buckwalter ruled on the departure request during a discussion of the § 3553(a) factors. In his motion, Fumo specifically asked the District Court whether it had intended to grant a variance rather than a departure.

7

Interestingly, in reply, the Government argued that "the Court repeatedly stated that it decided to grant the departure motion based on public service." *Id.* at 1635. The Government argued:

> But, it was Fumo himself who requested that the Court grant a downward departure on the basis of his public service. In his letter to the Probation Office stating objections to the presentence report, dated June 23, 2009, Fumo's counsel, while noting the possibility of both a departure and a variance, stated the following in a section entitled "Grounds for Departure": "A downward departure for Mr. Fumo is appropriate because of Mr. Fumo's health issues and his public service, either standing alone or in combination." Letter at 15. *See also id.* at 16 ("Mr. Fumo's record is not merely ordinary, rather it is extraordinary. As such, § 5H1.11 it [sic] is a valid basis for a downward departure."). Next, at a hearing on July 8, 2009, regarding the guideline calculation, Fumo's counsel strenuously advanced this position. In response, on July 9, 2009, the Court issued an order

8

which stated in part, "As it now stands, the offense level is 33. The court has already indicated that no departure will be granted based upon health, but a decision on a departure based upon good works will be reserved until time of sentencing on July 14, 2009. Then, at the sentencing hearing on July 14, 2009, the Court repeatedly stated that it decided to grant the departure motion based on public service. As the sentencing hearing for Ruth Arnao on July 21, 2009, the Court reiterated that it had given a departure to Fumo while stating that it would not similarly depart from Arnao's guideline range, but rather would grant a variance."

J.A. 1635. Although the Government had no trouble finding the District Court's intention to grant a downward departure crystal clear at sentencing, on appeal it disingenuously waffles on the issue and points to a statement that Judge Buckwalter added to his official "Statement of Reasons" for sentencing:

I next determined whether there should be a departure from the guidelines and announced at the sentencing hearing that there should be based on my finding

9

extraordinary good works by the defendant. I did not announce what specific guideline level the offense fell into; that is to say, the precise number of levels by which I intended to depart because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines.

Having advised counsel of the offense level that I found and my intent to depart downward, I then proceeded to hear from counsel their respective analyses of what an appropriate sentence should be.

The procedure I followed was perhaps more akin to that associated with a variance than a downward departure because I never announced nor have I ever determined to what guideline level I had departed. Ultimately, the argument over which it was elevated form over substance.

App. at 185-86. My colleagues seize upon this statement, finding the District Court's use of the words "vary" and "depart" confusing. Indeed, the Majority admits that but for this word choice, they would have found Judge Buckwalter's intentions clear. Reviewing for abuse of discretion, I find

10

none.  The record is sufficiently clear for me to bend toward the District Court and defer to its reasoning.

I agree with Fumo here and think this statement clears up any possible ambiguity instead of creating one.  Judge Buckwalter identifies the standard for granting a departure based on good works – extraordinary behavior and/or actions.  *See United States v. Kulick*, 629 F.3d 165, 176 (3d Cir. 2010).  Furthermore, the judge's statement indicates that he granted a downward departure for good works, not a variance: "I next determined that there should be a departure from the guidelines . . ."  Indeed, the sentence the majority points to as generating all the confusion ("I did not announce what specific guideline level the offense fell into; that is to say, the precise number of levels by which I intended to *depart* because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines.") contains a concrete statement that the District Court was granting a departure.  I read the use of the word "vary" in this particular phrase not hyper-technically or as a term of art, but rather in its everyday sense, meaning to alter or adjust.  I am neither confused nor unable to ascertain whether a departure or a variance was granted here.  It was a departure, clearly.

And, even were I in need of further clarification, I need turn no further than to Ruth Arnao's sentencing hearing.  The record there firmly establishes that the District Court knew it was granting Fumo a departure.  At Arnao's sentencing hearing, Judge Buckwalter specifically differentiated between the departure he gave Fumo and the variance he awarded Arnao: "So the fact that you, Ms. Arnao, at least did something in your lifetime to help other people, to

11

help other charities, it's not enough for me to depart from the guidelines, but it's certainly enough for me to consider to vary in some way from what the guidelines suggest here." J.A. 1836.

Let us not split hairs. Judge Buckwalter granted Fumo a § 5H1.11 departure and I see no reason to vacate and remand Fumo's sentence because the District Court's intentions were unclear.

My colleagues also fault Judge Buckwalter for failing to conduct a post-departure recalculation of the advisory sentencing range. I have two points of disagreement with them here. First, to my mind, the requirement of a post-departure recalculation of the advisory sentencing range, post-departure, injects a superfluous layer of computation into an already unnecessarily hyper-technical process. Second, Judge Buckwalter did recalculate the sentencing range post-departure.

In *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006), we established a relatively straightforward procedure for District Courts to follow in sentencing a criminal defendant post-*Booker*. First, district courts are to calculate a defendant's sentencing Guidelines range precisely as they would have pre-*Booker*. *Id.* Second, district courts were instructed to rule on any motions and state on the record whether they were granting a departure and, if so, how such a departure affects the initial Guidelines calculation. A district court should also take into account our pre-*Booker* case law, which continues to have advisory force. *Id.* Third and finally, district courts are required to exercise their discretion by considering the relevant 18 U.S.C. § 3553(a) factors in

12

setting their sentences, regardless of whether it varies from the original calculation. *Id.*

Although *Gunter* requires a district court to calculate the Guidelines range, that range is only "a starting point and initial benchmark" of the sentencing analysis. *United States v. Grober*, 624 F.3d 592, 609 (3d Cir. 2010) (citing *Gall v. United States*, 552 U.S. at 49 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.")). I see no requirement that a district court, after concluding that a departure is warranted, recalculate and specify a new adjusted sentencing range. *Gunter* only requires that a district judge indicate how the departure "affects the Guidelines calculation." *Gunter*, 462 F.3d at 247. A statement indicating whether the departure would go above or below the previously determined sentencing range would suffice.

The majority finds additional error in what they perceive as the District Court's failure to recalculate Fumo's advisory Guidelines range after announcing it would grant the former state senator a departure. I find no such error. Judge Buckwalter did recalculate the advisory range, albeit in terms of months rather than levels. The advisory Guidelines range was recalculated to be 121 to 151 months. He adopted this range, thereby satisfying step one of the *Gunter* analysis. At step two, he ruled on departure motions, announcing a downward departure to Fumo for his good works under § 5H1.11 and denying the Government's requested upward departure. Judge Buckwalter then reviewed the § 3553(a) factors and decided against any variances, satisfying step

13

three.  He then announced a sentence of fifty-five months, revealing a sixty-six month departure.

The recalculation the majority misses is easily found – a departure of sixty-six months from the 121 month bottom of the advisory Guidelines range left Fumo with a fifty-five month sentence.  It was not procedurally unreasonable for the District Court to determine the extent of its departure in terms of months instead of levels.  *See United States v. Torres*, 251 F.3d 138 (3d Cir. 2001).  My colleagues try to brush *Torres* aside as a "pre-*Booker* case." Maj. Op. at 48.  This they cannot do.  *Torres* retains vitality, post-*Booker*, as an advisory decision which we require district courts to consult.  *See Gunter*, 462 F.3d at 247 (noting that, at *Gunter's* first and second step, our pre-*Booker* case law is still to be considered, given its advisory force.); *United States v. Floyd*, 499 F.3d 308, 312, n.6 (3d Cir. 2007) (citing *Torres* for the factors to be considered in a §5K1.1 departure post-*Booker*); *see also Vazquez-Lebron*, 582 F.3d at 445.

Further, requiring the District Court to recalculate a sentencing range based on its sixty-six month departure is unfair because the sentencing ranges would overlap.  As Fumo pointed out, a sixty-six month departure would have put him into levels 23 and 24, leaving the District Court with a quandary: which level's sentencing range should it refer to under § 3553(a)(4)?  Asking the sentencing judge to choose a level comes close to requiring him to conceptualize the departure in terms of levels, which, of course, he does not have to do.  *See Torres*, 251 F.3d at 151.

Looking at this another way, I can easily find a recalculated sentencing range on this record.  During the

14

sentencing proceedings, the District Court granted Fumo's motion for a downward departure based on his good works and then chose, in the context of considering the required statutory factors, a sentence that adequately accounted for this finding—fifty-five months. In sentencing Fumo to fifty-five months, Judge Buckwalter implicitly announced a departure of eight levels, and then selected a corresponding range (51 to 63 months) at the § 3553(a) stage. *Id.* ("a departure measured in months is easily translated into offense levels."). I would not require more.

Judge Buckwalter complied with the requirements we have articulated for sentencing. He began by calculating an initial Guidelines range, a range which neither party argued he arrived at incorrectly. He then announced, at step two, that he would grant Fumo's motion for a departure, thereby indicating that his ultimate sentence would be below the advisory Guidelines range. At step three, he reviewed the § 3553(a) factors, determined he would not grant a variance, and announced a sentence of fifty-five months. The District Court touched all the procedural bases and consequently, did not err.

## C.

Finally, even were I to agree with the majority and find procedural error in the District Court's failure to recalculate the advisory Guidelines range post-departure, I would still dissent from vacating the sentence. I see no evidence that the District Court would have arrived at another sentence had it engaged in the additional post-departure calculation now required by the majority. As I stated before, Judge Buckwalter presided over this trial for five months and knows

15

more about Fumo than any of us. He granted Fumo a departure based on his good works and, in the context of full consideration of the § 3553(a) factors, chose a sentence that adequately accounted for his findings—fifty-five months imprisonment, a fine and restitution. This sentence would have been no different had the District Court announced its departure in terms of levels (8) and then selected a sentence from the corresponding range (51 to 63 months) at the § 3553(a) stage. This is exactly what Judge Buckwalter may do on re-sentencing to correct what the majority has perceived to be procedural error.[4]

I recognize that if we find procedural error at any step, we will generally "remand the case for re-sentencing, without going any further." *United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010). This approach, however, opens us up to serial appeals on procedural error issues before we reach our substantive reasonableness review. *United States v. Lychock*, 578 F.3d 214, 219-20 (3d Cir. 2009) (finding procedural error yet proceeding to analyze substantive reasonableness). *See also United States v. Stewart*, 597 F.3d 514, 525 (2d Cir. 2010) (Cabranes, J., dissenting sur denial of rehearing). Here, the record clearly demonstrates that the district court departed, why it departed, and the extent to which it departed.

II.

---

[4] Indeed, why put the District Court through a complete re-sentencing? If the majority finds the record confusing, why not, instead of vacating the judgment of sentence, simply remand for clarification?

I join my colleagues, however, in affirming Fumo's and Arnao's convictions. As the majority opinion relates, Fumo argues that the District Court abused its discretion in not dismissing juror Eric Wuest as a consequence of Wuest's Internet postings during the trial and jury deliberations.[5] Fumo also charges the District Court with abusing its discretion by refusing to question the other jurors about their exposure to juror Wuest's postings. I agree with my colleagues and find no abuse of discretion. I write separately, however, to briefly highlight the challenges that the proliferation of social media presents to our system of justice.

"The theory of our system," wrote Justice Holmes, "is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). Justice Holmes, of course, never encountered a juror who "tweets" during the trial. Courts can no longer ignore the impact of social media on the judicial system, the cornerstone of which is trial by jury. We have always understood that, although we operate from the presumption that a jury's verdict will be just and fair, jurors themselves can be influenced by a host of external influences that can call their impartiality into question. The availability of the Internet and the abiding presence of social networking now dwarf the previously held concern that a juror may be exposed to a newspaper article or

---

[5] An audio recording of the in-chambers examination of Juror Wuest by the District Court and counsel is online and available for listening. See http://www.philly.com/inquirer/special/4133127.html and http://www.philly.com/inquirer/special/41331457.html.

television program. The days of simply instructing a jury to avoid reading the newspaper or watching television are over. Courts must be more aggressive in enforcing their admonitions.

The Internet, especially social networking sites like Facebook and Twitter, have created a society that is "connected" at all times. Facebook, created in 2004, is arguably the most popular social networking platform. Facebook allows people to communicate with their family, friends and co-workers and to share information through the digital mapping of people's real-world social connections. *See* Facebook, Factsheet, available at http://www.facebook.com/press/info.php (last visited July 18, 2011). Currently, Facebook has over 500 million registered users, and these users spend over 700 billion minutes per month using the site. *Id.* The average user is connected to 80 community pages, groups or events. *Id.* Twitter was created in 2006 and is a real-time information network that lets people share and discuss what is happening at a particular moment in time. *See* Twitter, available at http://twitter.com/about (last visited July 18, 2011). Twitter has approximately 100 million users and differs from Facebook by allowing its users to send out a text message from their phones (up to 140 characters) to their followers in real time. *Id.* It is estimated that Twitter users send out over 50 million of these messages (or, Tweets) per day. *Id.* In other words, the effects and affects of electronic media are pervasive.

Jurors are not supposed to discuss the cases they hear outside the jury deliberation room. However, we know that

jurors have used Twitter and Facebook to discuss their service. For example:

 * In an Arkansas state court, a defendant attempted to overturn a $12.6 million verdict because a juror used Twitter to send updates during the trial. One post stated "Oh, and nobody buy Stoam. It's bad mojo and they'll probably cease to exist now that their wallet is 12m lighter."[6]

 * In Maryland, Baltimore Mayor Sheila Dixon sought a mistrial in her embezzlement trial because, while the trial was going on, five of the jurors became "Facebook friends" and chatted on the social networking site, despite the Judge's instructions not to communicate with each other outside of the jury room. Dixon's attorneys argued that these "Facebook friends" became a clique that altered the jury dynamic.[7]

---

[6] *See* Renee Loth, Mistrial by Google, Boston Globe, Nov. 6, 2009, at A15, available at http://www.boston.com/bostonglobe/editorial_ opinion/oped/articles/2009/11/06/mistrial_by_google/ (moving for a mistrial and reversal of a $12 million judgment based on a juror's Twitter posting stating: "oh, and nobody buy Stoam. Its [sic] bad mojo and they'll probably cease to Exist [sic], now that their wallet is 12m lighter.") (last visited August 1, 2011).
[7] Brendan Kearny, Despite Jurors Warning, Dixon Jurors Went on Facebook (2009), available at

19

    \*        In the United Kingdom, a case was thrown out because a juror sitting on a criminal matter wrote on her Facebook page that she was uncertain of the defendant's guilt or innocence and created a poll for her friends to vote.[8]

The examples of this type of behavior are legion. Not only are jurors tweeting, but they have been conducting factual research online, looking up legal definitions, investigating likely prison sentences for a criminal defendant, visiting scenes of crimes via satellite images, blogging about their own experiences and sometimes even reaching out to parties and witnesses through "Facebook friend" requests. *See* David P. Goldstein, *The Appearance of Impropriety and Jurors on Social Networking Sites: Rebooting the Way Courts Deal with Juror Misconduct*, 24 GEO. J. LEGAL ETHICS 589 (2011).

Of course, jurors doing independent research and/or improperly commenting on a case are not new phenomena. The Internet and social networking sites, however, have simply made it quicker and easier to engage more privately in juror misconduct, compromise the secrecy of their

---

http://mddailyrecord.com/2009/12/02/despite-judge%E2%80%99s-warning-dixon-jurors-went-on-facebook/ (last visited August 1, 2011).

[8] Urmee Khan, Juror Dismissed From a Trial After Using Facebook to Help Make a Decision, Telegraph.co.uk, Nov. 24, 2008, http://www.telegraph.co.uk/news/newstopics/lawreports/3510926/Juror-dismissed-from-a-trial-after-using-Facebook-to-help-make-a-decision.html (last visited August 1, 2011).

deliberations, and abase the sanctity of the decision-making process.  As we have seen in this case, jurors can use services like Facebook and Twitter to broadcast a virtual play-by-play of a jury's deliberations.

Technology, of course, will continue to evolve and courts must creatively develop ways to deal with these issues. In addition to the endorsement the majority opinion gives the recently proposed model jury instructions, I would encourage district courts to go further.  We must first educate jurors that their extra-curial use of social media and, more generally, the Internet, damages the trial process and that their postings on social media sites could result in a mistrial, inflicting additional costs and burdens on the parties specifically, and the judicial system generally.  I suggest that district courts specifically caution jurors against accessing the Internet to do research on any issues, concepts or evidence presented in the trial, or to post or seek comments on the case under review.

Indeed, I can envision a situation where a district judge might be called upon to sanction jurors for inappropriate Internet research or postings on social networking sites that threaten the integrity of the trial.  Such sanctions are not unheard of: a juror was recently fined $250.00 and ordered to write a five-page essay on the Sixth Amendment by a Michigan judge for posting biased comments about the case on Facebook.  Jameson Cook, VIDEO: *Dismissed Juror Ordered to Write Essay About Sixth Amendment*, Daily Tribune Review, September 2, 2010, available at http://www.dailytribune.com/articles/2010/09/02/news/doc4c 806a7b7e451383425678.txt (last visited July 19, 2011).  The threat of either fining jurors or holding them in contempt of court due to Internet misconduct may become necessary to

deter it and convey a public message that the judicial system cannot tolerate such behavior. Finally, the Bar also bears some responsibility. During voir dire, attorneys should routinely question jurors on their Internet usage and social networking habits. A juror's Internet activities have the potential to result in prejudice against a defendant, and counsel must expand the voir dire questioning to include inquiries into online activity.

Facebook, Twitter, and other Internet communication sites are a boon to the law and the courts. Improperly used, however, they could do real harm. Problems with jurors' continued use of these sites and others during their service must be anticipated and deterred.

### III.

In conclusion, I would affirm Fumo's and Arnao's convictions. I would also affirm the sentences imposed by the District Court.